1   SHARTSIS FRIESE LLP
ROBERT CHARLES WARD (Bar #160824)

2   rward@sflaw.com
One Maritime Plaza, Eighteenth Floor

3   San Francisco, CA  94111-3598
Telephone:   (415) 421-6500

4   Facsimile:   (415) 421-2922

5   ROLNICK KRAMER SADIGHI LLP
LAWRENCE M. ROLNICK (*pro hac vice forthcoming*)

6   lrolnick@rksllp.com
MARC B. KRAMER (*pro hac vice forthcoming*)

7   mkramer@rksllp.com
MICHAEL J. HAMPSON (*pro hac vice forthcoming*)

8   mhampson@rksllp.com
1251 Avenue of the Americas, 18th Floor

9   New York, NY  10020
Telephone:   (212) 597-2800

10   Facsimile:   (212) 597-2801

11

12   Attorneys for Plaintiffs

13             **UNITED STATES DISTRICT COURT**

14          **NORTHERN DISTRICT OF CALIFORNIA**

15               **OAKLAND DIVISION**

16   ALGER SMALL CAP GROWTH      Case No. CaseNumber
INSTITUTIONAL FUND (ALGER SICAV),

17   ALGER SMALL CAP GROWTH      **COMPLAINT**
INSTITUTIONAL FUND, ALGER SMALL

18   CAP GROWTH FUND, ALGER SMALL   **DEMAND FOR JURY TRIAL**
CAP FOCUS FUND, ALGER SMALL CAP

19   GROWTH PORTFOLIO, ALGER
WEATHERBIE SPECIALIZED GROWTH

20   PORTFOLIO, ALGER WEATHERBIE
SPECIALIZED GROWTH FUND, ALGER

21   DYNAMIC OPPORTUNITIES FUND, AND
ALGER DYNAMIC OPPORTUNITIES

22   FUND (ALGER SICAV),

23            Plaintiffs,

24        v.

25   WAGEWORKS, INC., JOSEPH L.
JACKSON, and COLM M. CALLAN,

26           Defendants.

27

28

_Vertical left margin text:_ SHARTSIS FRIESE LLP / ONE MARITIME PLAZA / EIGHTEENTH FLOOR / SAN FRANCISCO, CA  94111-3598

1

TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................ 1

JURISDICTION AND VENUE .......................................................................... 5

PARTIES .............................................................................................................. 6

I.      Plaintiffs ..................................................................................................... 6

II.     Defendants ................................................................................................. 8

FACTUAL ALLEGATIONS ............................................................................... 9

I.      WageWorks and the OPM Contract ......................................................... 9

II.     WageWorks' Reporting, Disclosure and Internal Control Obligations ......... 12

III.    WageWorks Improperly Recognizes Revenue from the OPM Contract ......... 20

IV.     WageWorks Fails to Record an Impairment Charge on the KP Connector ........ 23

V.      WageWorks' Lack of Internal Controls .................................................. 24

VI.     WageWorks Announces a Delay in the Filing of Its 2017 Audited Financial
        Results, the Existence of a Material Weakness in Its Internal Controls Over
        Financial Reporting, and the Commencement of an Audit Committee
        Investigation ............................................................................................ 25

VII.    The Audit Committee Announces that WageWorks' Historical Financial
        Statements Will Have to Be Restated and that the Company's CEO, CFO and
        General Counsel Are "Resigning" ........................................................... 26

VIII.   WageWorks' Independent Auditor Raises Additional Concerns with
        Management's Integrity and WageWorks Forms a Special Committee to
        Investigate the Audit Committee's Investigation .................................... 28

IX.     WageWorks Terminates Its Independent Auditor and Discloses Additional
        Accounting Issues .................................................................................... 31

X.      WageWorks Finally Files Its Restated Financial Results ........................ 32

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .............. 41

I.      Defendants Materially Misstate WageWorks' Financial Results ............ 41

II.     Defendants Misrepresent WageWorks' Compliance with U.S. GAAP and Falsely
        Certify the Accuracy of Its Periodic Reports .......................................... 47

III.    Misrepresentations Concerning Effectiveness of Internal Controls ........ 49

SUMMARY OF DEFENDANTS' SCIENTER .................................................. 56

PRESUMPTION OF RELIANCE ..................................................................... 59

PLAINTIFFS' ACTUAL RELIANCE .............................................................. 60

LOSS CAUSATION ........................................................................................... 61

NO SAFE HARBOR .......................................................................................... 66

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

FIRST CAUSE OF ACTION ................................................................. 67

SECOND CAUSE OF ACTION ........................................................... 69

THIRD CAUSE OF ACTION ............................................................... 70

FOURTH CAUSE OF ACTION ........................................................... 71

PRAYER FOR RELIEF ....................................................................... 73

JURY DEMAND .................................................................................. 73

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Plaintiffs Alger Small Cap Growth Institutional Fund (Alger SICAV), Alger Small Cap Growth Institutional Fund, Alger Small Cap Growth Fund, Alger Small Cap Focus Fund, Alger Small Cap Growth Portfolio, Alger Weatherbie Specialized Growth Portfolio, Alger Weatherbie Specialized Growth Fund, Alger Dynamic Opportunities Fund, and Alger Dynamic Opportunities Fund (Alger SICAV) (collectively, "Plaintiffs") are purchasers of common stock issued by WageWorks, Inc. ("WageWorks" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, for their federal securities and common law claims against WageWorks and its former executive officers Joseph L. Jackson and Colm M. Callan (the "Individual Defendants," and, collectively with WageWorks, the "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: WageWorks' filings with the United States Securities and Exchange Commission ("SEC"); public documents and media reports concerning WageWorks; analyst reports concerning WageWorks; and transcripts of conference calls and earnings calls involving Defendants; pleadings, motion papers, exhibits to declarations filed in the matter *In re WageWorks, Inc. Securities Litigation*, Case No. 18-cv-01523-JSW (N.D. Cal.) (the "Class Action"); the Court's June 1, 2020 Opinion and Order issued in the Class Action; and an SEC Cease-and-Desist Order issued in the matter *In the Matter of Joseph Jackson and Colm Callan*, SEC Administrative Proceeding File No. 3-20217 (Feb. 2, 2021) (the "SEC Cease-and-Desist Order"). Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is an action to recover significant investment losses suffered as a result of an accounting fraud perpetrated by Defendants.

Case No. _____                        COMPLAINT

2.     Unbeknownst to Plaintiffs, in 2016 and 2017, Defendants made material misrepresentations and failed to disclose material information in order to artificially inflate the price of WageWorks' common stock.  They did this by improperly recognizing revenue on one of WageWorks' most significant service contracts and by failing to record a multi-million-dollar impairment charge against a piece of unused software.  These accounting improprieties resulted in WageWorks publicly and materially overstating key accounting metrics.  The Company has now admitted that the revenue should never have been recognized and that the impairment charge should have been recorded in 2016.

3.     Defendants also falsely represented that they had designed a system of effective internal controls to ensure that WageWorks' financial results were accurately reported to the market.  As was later revealed through an internal investigation by the Audit Committee of WageWorks' Board of Directors and by a subsequent investigation of that investigation by a Special Committees of WageWorks' Board of Directors, the Individual Defendants – WageWorks' most senior executives over the relevant period – set a toxic "tone at the top" that created a culture where accurate and honest accounting was sacrificed and information was intentionally withheld from WageWorks' independent auditor.  As WageWorks has now admitted, and contrary to Defendants' public representations, the Company's internal control environment in 2016 and 2017 was largely nonexistent.

4.     In March 2016, WageWorks was selected by the United States Office of Personnel Management to administer the Federal Flexible Spending Account Program for federal government employees.  Under the terms of that contract, WageWorks was to begin administering the program on September 1, 2016, at which point WageWorks would begin earning a fixed fee based on the number of employees that participated in the program.  Defendant Jackson – WageWorks' then-CEO – emphasized the significance of the new government contract to WageWorks in his comments to investors in March 2016:  "2016 is off to a great start. . . .  Our selling season is progressing very well, highlighted by an exciting new relationship with the Federal government."

5.     However, unbeknownst to the market at the time, WageWorks began improperly

recognizing millions of dollars of revenue relating to the new government contract during the six months prior to September 1, 2016. To prevent its independent auditor from discovering the improper revenue recognition during its year-end audit of WageWorks' financial statements, in early 2017 WageWorks issued a bogus invoice to the federal government for more than $5 million for work performed prior to September 1, 2016. Of course, the federal government refused to pay the invoice, but Defendants were able to continue to conceal the fraud by contesting the nonpayment. The revenue that WageWorks improperly recognized from the government contract caused its publicly reported financial results to be materially overstated.

6.     Also unbeknownst to outside investors at the time, WageWorks continued to carry millions of dollars of value on its books in 2016 and 2017 in connection with software called the "KP Connector," even though the only customer for the KP Connector discontinued its use of that software in the second quarter of 2016. At that time, WageWorks should have recorded an impairment assessment for the KP Connector – writing its value down to $0. However, by not recording such an impairment, Defendants materially overstated WageWorks' publicly reported financial results.

7.     This accounting fraud went undetected by the investing public for a significant period of time. However, on March 1, 2018, Wage Works shocked the market by revealing that it was delaying the filing of its 2017 annual report, its 2017 audited financial results, and its earnings call for the fourth quarter of 2017. WageWorks told investors that it had discovered a material weakness in its internal controls over financial reporting, and that the Audit Committee of its Board of Directors would be conducting an investigation concerning the accuracy of the Company's prior financial statements.

8.     Then, on April 5, 2018, WageWorks issued a press release announcing that its prior financial statements for 2016 and the first three quarters of 2017 "should be restated" and "should no longer be relied upon." According to the Company, it had drastically overstated its revenue in 2016. Perhaps more shockingly, WageWorks also revealed that its CEO, CFO, and General Counsel had all suddenly "resigned," indicating that they had engaged in improper conduct that had led to the need for WageWorks to restate its financial reports for an almost two-

Case No.                          COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

year period.  Indeed, a subsequent SEC Cease-and-Desist Order against the CEO and CFO confirms that they left WageWorks "as a result of the events surrounding" WageWorks' restating of its financial results.

9.      Had it not been for WageWorks' independent auditor – KPMG – the accounting fraud perpetrated by Defendants may never have been discovered.  In connection with the Audit Committee's internal investigation, KPMG privately notified WageWorks that, among other things: (a) it could no longer rely on the representations of Defendants Jackson and Callan; (b) WageWorks had improperly recognized revenue; and (c) it believed the scope of the Audit Committee investigation should be widened due to the impact of the misstatements identified and KPMG's inability to rely on WageWorks internal controls over financial reporting. Subsequently, KPMG found out that the executives dismissed on April 5, 2018 had accused the Audit Committee, the Company's newly appointed CEO, and the Company's corporate counsel of being aware that information was withheld from KPMG in 2017.  In response, KPMG privately reached out to WageWorks' lead independent director to raise additional concerns about the Audit Committee's investigation and recommended that WageWorks take a series of actions to address its concerns, including forming a special committee of independent directors to investigate the Audit Committee and removing Defendant Jackson from WageWorks' Board of Directors (which WageWorks did in September 2018).

10.      However, rather than commend KPMG for unveiling the fraud, WageWorks terminated KPMG as its independent auditor because WageWorks wanted to "accelerate the audit process" for 2017.   At that time, KPMG still was not comfortable signing off on WageWorks' 2017 financial statements.

11.      On March 18, 2019, WageWorks finally filed its restated financial statements for 2016 and its audited financial statements for 2017 (with a new outside auditor having been retained to replace KPMG).  WageWorks admitted that it had improperly recognized revenue from the government flexible spending account contract prior to September 1, 2016, and that it had failed to timely record an impairment charge on the KP Connector.  WageWorks also disclosed a host of material weaknesses in its internal controls over financial reporting in 2016

- 4 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

and 2017.  WageWorks summarized those severe flaws in its control environment as follows:

> Based on the investigations conducted under the direction of the Audit Committee of the Board, it was concluded that ***there was an inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from former senior management concerning a complex transaction with the federal government that contributed to an ineffective control environment driven by the tone at the top.  Management's failure to timely communicate all pertinent information resulted in an environment which led to an error in the financial statements during the years ended December 31, 2017 and December 31, 2016 and the related interim periods within those years*.[1]
>
> In addition, we did not maintain effective internal control over financial reporting related to the following areas: control environment, risk assessment, control activities and monitoring[.]

12.    Plaintiffs are investment funds that purchased WageWorks common stock during the time when, unbeknownst to Plaintiffs, WageWorks' financial reports contained materially false and misleading financial information and other statements.  As the truth was gradually and partially disclosed and processed by the market, thereby causing WageWorks' stock price to decline, Plaintiffs suffered significant investment losses.

13.    Plaintiffs bring this action under the federal securities laws and under the common law to recover damages for the losses they suffered as a result of Defendants' materially false and misleading misstatements and failure to disclose material information.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

---

[1] Unless otherwise noted, bold and italic emphases have been added and do not appear in original quotation.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1    17.   In connection with the acts, transactions and conduct alleged herein, Defendants,

2   directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

3   not limited to, the United States mails, interstate telephone communications and the facilities of a

4   national securities exchange and market.

5                                    **PARTIES**

6   **I.    Plaintiffs**

7    18.   Plaintiff Alger Small Cap Focus Fund (Alger SICAV) is sub-fund of Alger

8   SICAV whose sub-investment adviser has its main office location in New York, New York.  It

9   purchased WageWorks' common stock at artificially inflated prices on and after September 30,

10  2016, and held WageWorks' common stock through and after March 1, 2018, when the first of a

11  series of partial but inadequate disclosures was issued correcting the prior false and misleading

12  statements and as the foreseeable risks previously concealed by Defendants' material

13  misstatements and omissions partially materialized.

14   19.   Plaintiff Alger Small Cap Growth Institutional Fund is a series of The Alger

15  Institutional Funds whose investment adviser has its main office location in New York, New

16  York.  It purchased WageWorks' common stock at artificially inflated prices on and after July

17  10, 2017, and held WageWorks' common stock through and after March 1, 2018, when the first

18  of a series of partial but inadequate disclosures was issued correcting the prior false and

19  misleading statements and as the foreseeable risks previously concealed by Defendants' material

20  misstatements and omissions partially materialized.

21   20.   Plaintiff Alger Small Cap Growth Fund is a series of The Alger Funds whose

22  investment adviser has its main office location in New York, New York.  It purchased

23  WageWorks' common stock at artificially inflated prices on and after November 30, 2016, and

24  held WageWorks' common stock through and after March 1, 2018, when the first of a series of

25  partial but inadequate disclosures was issued correcting the prior false and misleading statements

26  and as the foreseeable risks previously concealed by Defendants' material misstatements and

27  omissions partially materialized.

28   21.   Plaintiff Alger Small Cap Focus Fund is a series of The Alger Funds whose

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                          COMPLAINT

investment adviser has its main office location in New York, New York. It purchased WageWorks' common stock at artificially inflated prices on and after June 29, 2016, and held WageWorks' common stock through and after March 1, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized.

22.     Plaintiff Alger Small Cap Growth Portfolio is a series of The Alger Portfolios whose investment adviser has its main office location in New York, New York. It purchased WageWorks' common stock at artificially inflated prices on and after December 29, 2016, and held WageWorks' common stock through and after March 1, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized.

23.     Plaintiff Alger Weatherbie Specialized Growth Portfolio is a series of The Alger Portfolios whose investment adviser has its main office location in New York, New York. It purchased WageWorks' common stock at artificially inflated prices on and after June 22, 2016, and held WageWorks' common stock through and after March 1, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized.

24.     Plaintiff Alger Weatherbie Specialized Growth Fund is a series of The Alger Funds whose investment adviser has its main office location in New York, New York. It purchased WageWorks' common stock at artificially inflated prices on and after June 22, 2016, and held WageWorks' common stock through and after March 1, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized.

25.     Plaintiff Alger Dynamic Opportunities Fund is a series of The Alger Funds II

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

whose investment adviser has its main office location in New York, New York. It purchased WageWorks' common stock at artificially inflated prices on and after February 23, 2017, and held WageWorks' common stock through and after March 1, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized.

26.     Plaintiff Alger Dynamic Opportunities Fund (Alger SICAV) is sub-fund of Alger SICAV whose sub-investment adviser has its main office location in New York, New York. It purchased WageWorks' common stock at artificially inflated prices on and after March 28, 2017, and held WageWorks' common stock through and after March 1, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized.

27.     At all relevant times, Fred Alger Management, LLC (f/k/a Fred Alger Management, Inc.) ("FAM") acted as investment or sub-investment adviser to Plaintiffs in connection with their purchases of WageWorks' securities.

## II.     Defendants

28.     Defendant WageWorks is a Delaware corporation with its headquarters in San Mateo, California. WageWorks is an administrator of employee Health Savings Accounts, health and dependent care Flexible Spending Accounts, Health Reimbursement Arrangements, and other employee benefit programs. Until recently, WageWorks common stock was publicly traded in the United States on the New York Stock Exchange (the "NYSE") under the ticker symbol "WAGE." Trading in WageWorks stock was suspended on August 30, 2019, and WageWorks stock was delisted from the NYSE on September 10, 2019, as result of the consummation of a merger between WageWorks and HealthEquity, Inc. ("HealthEquity"), pursuant to which WageWorks became a wholly owned subsidiary of HealthEquity.

29.     Defendant Joseph L. Jackson ("Jackson") joined WageWorks as its Chief Executive Officer ("CEO") and a member of its Board of Directors ("Board") in 2007. Jackson

was removed as CEO of WageWorks in April 2018 in connection with the events alleged herein. Although he continued to serve on WageWorks' Board for a short while thereafter, WageWorks severed all ties with Jackson in September 2018.

30.     Defendant Colm M. Callan ("Callan") joined WageWorks as its Chief Financial Officer ("CFO") in September 2014.  Callan was removed as CFO of WageWorks in August 2018 in connection with the events alleged herein.

## FACTUAL ALLEGATIONS

### I.     WageWorks and the OPM Contract

31.     WageWorks describes itself as a leader in administering Consumer-Directed Benefits ("CDBs"), which, according to WageWorks' SEC filings, "empower employees to save money on taxes and provide corporate tax advantages for employers."  These CDBs include Health Savings Accounts, Flexible Spending Accounts, Health Reimbursement Arrangements, as well as transit and parking programs, wellness programs, COBRA, and other employee benefits.

32.     Flexible Spending Accounts ("FSAs") are benefits plans that allow employees to use pre-tax dollars to pay for eligible healthcare expenses that are not generally covered by insurance, such as co-pays, deductibles, over-the-counter medical products, and vision expenses. By contributing to an FSA, an employee can reduce the amount of federal and state income taxes they pay, as wells as payroll taxes.

33.     In March 2016, WageWorks was selected by the United States Office of Personnel Management ("OPM") to administer the FSA for federal government employees (the "Federal Flexible Spending Account Program" or "FSAFEDS Program").

34.     OPM is an executive branch agency that effectively operates as the human resources department for the federal government.  It administers the Civil Service Retirement System, the Federal Employees Retirement System, the Federal Employees Health Benefits Program, the Federal Employees Dental and Vision Insurance Program, the Federal Employees' Group Life Insurance Program, and the Federal Long Term Care Insurance Program.

35.     OPM had first sought solicitations for a new administrator of the FSAFEDS Program in late 2014.  At that time, the existing contract had not been subject to any bidding

Case No.             COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

competition for several years.  The existing contractor was initially awarded the contract to administer the FSAFEDS in 2003.  OPM extended that contract on four occasions without opening up a competitive bidding process.  In October 2015, the Inspector General for OPM expressed "serious concerns" about the lack of competition, thus highlighting the importance of OPM receiving the best value for the administration of the FSAFEDS in the new contract.

36.     The new contract was to be a multi-year agreement.  The pricing guidelines provided by OPM stated that "pricing is all inclusive and FFP [firm-fixed-price]."   OPM assigned solicitation number OPM35-14-R-0004 to the bidding process.

37.     WageWorks submitted its proposal in response to the solicitation on February 13, 2015.  Winning the OPM contract would be a very significant achievement for WageWorks, as the FSAFEDS had 1.8 million eligible employees, a number that would grow to 2.3 million eligible employees by early 2016.  That translated into approximately an additional 350,000 WageWorks users.

38.     On November 5, 2015, OPM advised WageWorks that its proposal was within the competitive range.  OPM then conducted discussions with WageWorks, including the topic of its price proposal.

39.     On December 24, 2015, OPM continued discussions with WageWorks, again informing the Company that its offer was within the competitive range.   OPM required additional development information and requested that WageWorks furnish the basis of its unit cost or pricing detail of the total dollars per "Contract Line Item Number" or "CLIN" to determine WageWorks' cost to perform the contract.

40.     On January 4, 2016, WageWorks submitted a "Revised Volume 2 Price Proposal." Discussions continued thereafter between OPM and WageWorks on or about February 1, 2016, and February 11, 2016.

41.     On February 15, 2016, WageWorks submitted its final revised proposal to OPM, which OPM accepted.

42.     On March 1, 2016, WageWorks and OPM entered into Contract No. OPM3516C003 (the "OPM Contract").  WageWorks publicly announced that it expected to

begin administering the FSAFEDS on September 1, 2016.

43. The OPM Contract was a "a five-year firm-fixed-price (FFP) contract." The per-account, per-month unit price specified in the agreement was $2.53. During "Base Year 1" of the OPM Contract, March 1, 2016 through August 31, 2016, WageWorks was obligated to develop and establish the website and processing system for the program at no cost to OPM.

44. WageWorks was to take over administration of the FSAFEDS on September 1, 2016, and the prior administrator was to cease its administration on August 31, 2016. Thus, once development was completed and OPM granted WageWorks authorization to operate, WageWorks could begin administering benefits on September 1, 2016.

45. On March 7, 2016, WageWorks issued a press release announcing the contract. Defendant Jackson was quoted as follows: "We are extremely pleased that OPM selected us to administer their FSAFEDS Program . . . . We look forward to partnering with OPM and bringing our advanced technology and superior service capabilities to the Federal Government."

46. In announcing its financial results for the first quarter of 2016, Defendants Jackson highlighted the new OPM Contract in the Company's accompanying press release:

> 2016 is off to a great start. We see encouraging results in our commuter business and demand across all of our healthcare offerings remains strong, especially as it relates to Health Savings Accounts. Our selling season is progressing very well, **highlighted by an exciting new relationship with the Federal government**. Our channel partnership and exchange business is growing, and we are successfully fostering existing relationships and continuously developing new opportunities. As we move through 2016, we are well positioned to execute on our multiple avenues for growth and drive leverage in the business.

47. The OPM Contract provided that "Security Authorization documentation must be developed with the use of OPM security documentation templates." On March 10, 2016, during a post-award, kick-off teleconference between OPM and WageWorks, OPM imposed new plan design requirements and advised that its security requirements were under revision.

48. On March 17, 2016, a WageWorks project implementation employee emailed OPM a question regarding billing for Base Year 1. On March 29, 2016, an OPM employee replied that OPM would not pay WageWorks for Base Year 1, and Defendant Callan shared this response with Defendant Jackson.

- 11 -
Case No.                              COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

49.   On April 20, 2016, the OPM contracting officer, Cheryl Allen, alerted WageWorks to the fact that revised security requirements were being prepared.

50.   On June 10, 2016, representatives from OPM and WageWorks held a meeting to confer with respect to OPM's new plan design and security requirements.  On a phone call that day between WageWorks' project implementation employees and OPM employees, an OPM employee again indicated that OPM would not pay for Base Year 1.  A WageWorks employee told Defendant Callan about this statement in an email, and Defendant Callan forwarded that email to Defendant Jackson and another WageWorks executive

51.   OPM and WageWorks entered into a modification of the OPM Contract in July 2016, which was referred to as "Modification Number M0001 to Contract Number OPM3516C0003."  Among other things, this amendment added three "Information Technology Contract Clauses," six "OPM-Specific Clauses," and made further revisions to the FSAFEDS administration, enhancing security.  If WageWorks did not meet the new information technology requirements necessary to receive "Authorization to Operate (ATO)," its right to administer FSAFEDS would be put in jeopardy.

52.   WageWorks' General Counsel, Kim Wilford, executed the amendment to the OPM Contract on the Company's behalf on July 20, 2016.  As with her execution of the OPM Contract on WageWorks' behalf, Wilford could execute the amendment only with the approval of the Individual Defendants.

53.   The OPM Contract, as amended, was clear that it was a firm-fixed-contract where WageWorks would be paid for administering the FSAFEDS program to participating federal employees.  WageWorks would be paid for administering the FSAFEDS benefits only, and would not be paid for the preliminary setup.  Because WageWorks was not administering the FSAFEDS program prior to September 1, 2016, it was not entitled to any remuneration under the OPM Contract prior to that date.

**II.   WageWorks' Reporting, Disclosure and Internal Control Obligations**

54.   Under the federal securities laws and the regulations and guidance promulgated by the SEC pursuant to those laws, companies whose stock is publicly traded in the U.S. – such

as WageWorks' stock was at all relevant times – have important reporting and disclosure obligations.

55.     Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and their financial condition.   Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.

56.     To ensure the accuracy of their financial disclosures, the CEO and CFO of a public company are required to certify them.   Specifically, Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") requires the CEO and the CFO to certify that the information in each periodic report containing financial statements filed with the SEC "fairly presents, in all material respects, the financial condition and results of operations" of the company (the "Section 906 Certification").

57.     Public companies also are required to have their annual financial statements professionally audited.  SOX requires that the Board of Directors of a public company appoint an independent "Audit Committee" that is responsible for the oversight of the engagement of the company's auditor.

58.     The following table sets forth the periodic filings that WageWorks made with the SEC during the relevant period, the date they were filed with the SEC, which of the Defendants signed those filings, which of the Defendants signed the Section 906 Certification, and how they will be referred to throughout this Complaint:

| Description of Filing | Date of Filing | Defendant Signatories | Section 906 Certification | Abbreviation |
|---|---|---|---|---|
| Form 10-Q for quarter ended March 31, 2016 | May 5, 2016 | Callan | Jackson & Callan | "2016 First Quarter Report" |
| Form 10-Q for quarter ended June 30, 2016 | August 9, 2016 | Callan | Jackson & Callan | "2016 Second Quarter Report" |
| Form 10-Q for quarter ended September 30, 2016 | November 9, 2016 | Callan | Jackson & Callan | "2016 Third Quarter Report" |
| Form 10-K for year ended December 31, 2016 | February 23, 2016 | Jackson & Callan | Jackson & Callan | "2016 Annual Report" |

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

| Description of Filing | Date of Filing | Defendant Signatories | Section 906 Certification | Abbreviation |
|---|---|---|---|---|
| Form 10-Q for quarter ended March 31, 2017 | May 4, 2017 | Callan | Jackson & Callan | "2017 First Quarter Report" |
| Form 10-Q for quarter ended June 30, 2017 | August 1, 2017 | Callan | Jackson & Callan | "2017 Second Quarter Report" |
| Form 10-Q for quarter ended September 30, 2017 | November 8, 2017 | Callan | Jackson & Callan | "2017 Third Quarter Report" |

59.     As a publicly traded corporation with significant operations in the U.S., WageWorks was at all relevant times required to prepare its financial statements in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP") in order for those financial statements not to be deemed misleading and inaccurate.  U.S. GAAP is a set of rules and standards that are designed to ensure uniform financial reporting.

60.     For example, U.S. GAAP contains strict rules about how and when WageWorks could recognize revenue from its FSA administration contracts.

61.     Statement of Financial Accounting Concepts No. 5 ("FASCON 5") provides that, revenue must be "earned" and "realized or realizable" in order for it to be recognized, stating in pertinent part:

> Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

62.     Revenue is "realized" or "realizable" when assets related to the revenue-earning activity are readily convertible to cash or claims to cash.

63.     ASB Accounting Standards Codification Topic 605 ("ASC 605") contains the same standards for recognizing revenue as FASCON 5.

64.     The SEC itself has issued guidance on revenue recognition in Staff Accounting Bulletin No. 104 ("SAB 104").  SAB 104 states that:

> [R]evenue generally is realized or realizable and earned when all of the following criteria are met:

- 14 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectability is reasonably assured.

65.    WageWorks was fully aware of these revenue recognition standards, and represented to investors that it abided by them.   For example, in its 2016 Annual Report, WageWorks described its revenue recognition policies in pertinent part as follows:

> We report revenue for the following product offerings: healthcare, commuter, COBRA and other services. Our revenues are primarily attributable to fees for services we provide to employer clients.
>
> Healthcare and commuter programs generate revenues from the monthly services we provide in connection with their employees' participation in CDB accounts.  COBRA revenue is generated from the administration of continuation of coverage services for participants who are no longer eligible for the employer's health benefits.  Other revenue includes services related to enrollment and eligibility, non-healthcare, employee account administration (i.e., tuition and health club reimbursements) and project-related professional fees.   Fees associated with services are recognized in the period services are rendered and earned in accordance with service arrangements with clients where fees are fixed or determinable and collectability is reasonably assured.

66.    In addition to revenue recognition, U.S. GAAP also imposes standards for when an impairment charge must be recorded for a long-lived asset of a company.

67.    Accounting Standards Codification, General Intangibles Other Than Goodwill ("ASC 350"), states that intangible assets that are subject to amortization shall be reviewed for impairment in accordance with Accounting Standards Codification Subtopic 360-10, Property, Plant, and Equipment ("ASC 360-10").  (ASC 350-30-35-14.)  ASC 360-10 states that a long-lived asset must be "tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable."  (ASC 360-10-35-21.)  If events or changes in circumstances indicate that a long-lived asset is not recoverable, the company must weigh the carrying value of such asset against its fair value.  If the asset's fair value is below its carrying value, the difference between the two is considered an impairment loss that must be recognized by writing down the carrying value of the asset to its fair value and concurrently

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                                COMPLAINT

1   recognizing such impairment loss on the company's financial statements. (ASC 360-10-35-17.)

2       68.    As with the revenue recognition standard, WageWorks was fully aware of these

3   impairment assessment standards, and represented to investors that it abided by them.   For

4   example, in its 2016 Form 10-K, WageWorks stated:

> The Company reviews long-lived assets for indicators of impairment whenever events or changes in circumstances indicate that the carrying amounts of such assets may not be recoverable. Long-lived assets consist primarily of software development costs, office equipment, leasehold improvements and definite-lived assets.  An impairment of long-lived assets exists when the carrying amount of a long-lived asset group, exceeds its fair value. Impairment losses are recorded when the carrying amount of the impaired asset group is not recoverable. Recoverability is determined by comparing the carrying amount of the asset or asset group to the undiscounted cash flows which are expected to be generated from its use.  If the carrying amount of the asset group exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset or asset group exceeds its fair value.

13       69.    In addition to complying with U.S. GAAP, public companies are required to

14   follow the standards developed by the SEC governing what information must be disclosed in

15   financial statements and other public filings.

16       70.    Even when a public company provides financial information to investors that is

17   not prepared in accordance with U.S. GAAP (i.e., "Non-GAAP" financial information), that

18   information must still be true and accurate.  SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) prohibits a

19   company from making materially false or misleading statements in connection with the purchase

20   and sale of its securities.

21       71.    In addition, with respect to assessing materiality in preparing financial statements,

22   the SEC has released Staff Accounting Bulletin No. 99 ("SAB 99"), which emphasizes the

23   importance of qualitative factors in determining materiality.  In SAB 99, the SEC stated that

24   while it had no objection to using a numerical threshold of 5% as a starting point in assessing

25   materiality, "quantifying, in percentage terms, the magnitude of a misstatement is only the

26   beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full

27   analysis of all relevant considerations."

28       72.    In SAB 99, the SEC set forth numerous factors that might render a quantitative

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                        COMPLAINT

misstatement of revenue under 5% qualitatively material.  These include, but are not limited to:

- whether a known misstatement may result in a significant positive or negative market reaction;

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

73.    A company that restates its previously reported financial results does so only if the prior errors were materially inaccurate.  SEC Statement of Accounting Bulletin 108 ("SAB 108") provides that correcting prior year financial statements for immaterial errors does "not require previously filed reports to be amended."

74.    Public companies also are required to maintain effective internal controls.  An issuer's top-ranking executives must be involved in creating and designing these controls, and also must personally guarantee their effectiveness.

75.    The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance."   With respect to the reporting and compliance aspects of this definition, the *Integrated Framework* specifically states that "[w]hen internal control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations."   *See* The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* § 3 ("Requirements for Effective Internal Control").

76.    Section 404 of SOX requires public companies to publish information in their

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                                    COMPLAINT

annual reports concerning the scope and adequacy of their internal control structure and procedures for financial reporting, and also to assess the effectiveness of such internal controls and procedures.  In its interpretive guidance issued for the rules promulgated to implement Section 404, the SEC instructed that "management should evaluate whether it has implemented controls that adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner.  [This involves] a top-down, risk-based approach . . . , including the role of entity-level controls in assessing financial reporting risks and the adequacy of controls."  *Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, Exchange Act Release No. 55929, § I (June 20, 2007).   When management identifies a control deficiency, it cannot claim that its internal controls are effective if the control deficiency is deemed to be a material weakness.

77.     Section 302 of SOX requires a public company's chief executive officer and chief financial officer to provide certifications concerning their review of, and disclosure of information about, the company's internal controls.  Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO and CFO are required to certify in each periodic report that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

- based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

- he or she and the other certifying officers:

    o are responsible for establishing and maintaining "disclosure controls and procedures" [i.e., controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is

Case No.                                    COMPLAINT

recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;

o   have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

o   have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and

o   have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

•   he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

o   all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

o   any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

•   he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release 46427, § II.A (Sept. 9, 2002) (footnotes omitted).

78.   The CEO certifications to the periodic filings set forth in the table in paragraph 58 were all signed by Defendant Jackson.

79.   The CFO certifications to the periodic filings set forth in the table in paragraph 58 were all signed by Defendant Callan.

80.   Throughout the relevant period, Defendants represented to investors that WageWorks was complying with these important public reporting obligations by timely

Case No.
COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1    disclosing truthful material facts about its business, accurately reporting its financial results, and

2    maintaining effective internal controls.  However, as explained in greater detail below, and

3    unbeknownst to the market, Defendants made material misrepresentations that artificially

4    inflated the price of WageWorks' common stock.

5    **III.    WageWorks Improperly Recognizes Revenue from the OPM Contract**

6        81.    The OPM Contract was a firm-fixed-contract where WageWorks would be paid

7    for administering, but not for the initial set up of, the FSAFEDS program to participating federal

8    employees.  WageWorks did not commence administering the FSAFEDS program until

9    September 1, 2016.  Therefore, WageWorks was not entitled to any remuneration under the

10   OPM Contract prior to September 1, 2016.  In fact, on two occasions OPM employees expressly

11   told WageWorks representatives that OPM would not pay for any services rendered prior to

12   September 1, 2016, and OPM's position was relayed on both occasions to Defendants Jackson

13   and Callan.

14       82.    Unbeknownst to the market at the time, however, WageWorks began recognizing

15   revenue from the OPM Contract prior to September 1, 2016.  In doing so, Defendants

16   prematurely and improperly recognized revenue that had not yet been received and that they had

17   no reasonable basis to estimate at the time.

18       83.    In the second quarter of 2016, WageWorks' reported revenue included $1.1

19   million from the OPM Contract, even though WageWorks had not yet achieved implementation,

20   Authorization to Operate, and had not started administering the FSAFEDS program.

21   WageWorks' accounting staff recognized this revenue at the direction of Defendant Callan, who

22   led them to believe that collection of this revenue was reasonably assured but failed to tell them

23   that OPM had twice indicated that it would not pay WageWorks for any work performed prior to

24   September 1, 2016.

25       84.    Defendants did not actually issue an invoice to OPM at that time.  However,

26   during the second quarter, Defendant Callan had discussions with WageWorks's accounting staff

27   and WageWorks's independent auditor – KPMG – regarding the accounting treatment for the

28   OPM Contract.  During a discussion on or about April 9, 2016, Callan falsely told a KPMG

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 20 -

1   partner that OPM had agreed to pay WageWorks for the Base Year 1 period under the OPM

2   Contract.

3       85.   In the third quarter of 2016, WageWorks' reported revenue included $2.3 million

4   from the OPM Contract recorded prior to September 1, 2016.

5       86.   Again, Defendants did not issue an invoice to OPM for those amounts at that

6   time.  Instead, on or about September 26, 2016, Defendant Callan attended a WageWorks' "Pre-

7   Close Meeting" for the third quarter, during which he falsely assured his accounting staff that

8   OPM had agreed to pay WageWorks for the unpaid receivable.  He did not disclose that OPM

9   employees had twice indicated that OPM would not pay WageWorks for that work.

10      87.   On November 9, 2016, Defendants Jackson and Callan signed a "management

11  representation letter" to KPMG representing they had that continually assessed the collectability

12  of all amounts that WageWorks said it was owed by OPM and determined that those amounts

13  were reasonably assured of collection.  However, neither Jackson nor Callan disclosed to KPMG

14  that OPM had twice indicated that it would not pay WageWorks for the amounts that

15  WageWorks claimed it was owed under the OPM Contract at that time.

16      88.   Defendants knew that they should not have been recognizing revenue from the

17  OPM Contract prior to September 1, 2016.  They did so, however, to increase WageWorks'

18  reported revenues and revenue-related metrics, such as net income and earnings-per-share.  This,

19  in turn, had the effect of artificially inflating WageWorks' stock price, which allowed

20  Defendants to execute a June 2017 stock offering at inflated prices.

21      89.   However, before the Company could close its books for the year ending

22  December 31, 2016, WageWorks had to submit to and pass an audit process conducted by its

23  independent outside auditor – KPMG.

24      90.   The lack of any invoicing for the revenue WageWorks had recognized in

25  association with the OPM Contract for the second and third quarters of 2016 would have raised a

26  significant red flag during KPMG's audit of WageWorks' 2016 financial statements.

27      91.   Accordingly, in order to satisfy any inquiry by KPMG as to the propriety of

28  recognizing revenue with respect to the OPM Contract, Defendants issued an invoice to OPM

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 21 -

1    (Invoice No. 37943) on February 15, 2017, for services it claimed were payable from March 1,

2    2016 through August 31, 2016.  In the invoice, WageWorks improperly claimed that OPM owed

3    it $5,117,856.39.

4              92.    Not surprisingly, given that the amounts were not owed under the OPM Contract,

5    OPM ultimately refused to pay the invoice.  On February 24, 2017, OPM rejected WageWorks'

6    invoice.  Then, on or about March 3, 2017, OPM explained to Defendant Callan and other

7    WageWorks personnel that it had rejected the invoice because it did not believe it owed

8    WageWorks for the Base Year 1 period.

9              93.    In connection with KPMG's review of WageWorks' year-end financials, a KPMG

10   audit partner interviewed Defendant Callan about amounts purportedly owed WageWorks by

11   OPM.  Callan replied that WageWorks was working on collection. but failed to disclose to the

12   KPMG audit partner that OPM had rejected WageWorks' invoice.

13             94.    On or about March 29, 2017, WageWorks' accounting staff asked Defendant

14   Callan if there were any updates regarding payment of the amounts that OPM purportedly owed

15   to WageWorks.  In response, Callan told the accounting staff that WageWorks was talking to

16   OPM, but he failed to disclose to them that OPM had denied that it owed WageWorks anything

17   under the OPM Contract prior to September 1, 2016.

18             95.    Between March 3 and August 17, 2017, WageWorks and OPM officers and

19   employees exchanged emails, letters, phone calls, and voicemails related to the OPM Contract.

20   Throughout this period, OPM reiterated that it did not intend to pay WageWorks for work

21   performed prior to September 1, 2016.  Despite being aware of OPM's position, Defendants

22   Jackson and Callan continued to mislead WageWorks' accounting staff and KPMG about the

23   status of the dispute with OPM.

24             96.    In order to extend the illusion that it was entitled to the revenue, on August 18,

25   2017, WageWorks submitted a certified claim to OPM for the amounts reflected in Invoice No.

26   37943.  OPM denied the certified claim in a Contracting Officer's Final Determination

27   ("COFD") and dated December 22, 2017.

28             97.    However, by initially providing the invoice to KPMG, and failing to tell KPMG

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 22 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1   about the dispute with OPM, Defendants were able to mislead KPMG into believing that the

2   revenue recognized under the OPM Contract prior to September 1, 2016 was validly earned,

3   when it actually was not, and to get KPMG to sign off on the 2016 Annual Report.

4         98.    In the first quarter, second quarter, and third quarter of 2017, WageWorks

5   continued to carry on its balance sheet the amount of false revenue it had recorded in connection

6   with the OPM Contract, inflating reported accounts receivable by at least $5.1 million each

7   quarter.  This was improper, and – as further explained below – was ultimately discovered by

8   KPMG during its 2018 audit of WageWorks.

9   **IV.**    **WageWorks Fails to Record an Impairment Charge on the KP Connector**

10        99.    Prior to 2016, WageWorks developed software called the "KP Connector" for the

11  benefit of, and based on specifications outlined in an agreement with, a single client.

12        100.    In view of its narrow purpose, the KP Connector software had value to

13  WageWorks only so long as this one client continued to require its use.

14        101.    To account for the costs associated with the development of the KP Connector

15  software in accordance with U.S. GAAP, WageWorks capitalized the costs it incurred to develop

16  the software and reported such capitalized costs as assets in the "Property and Equipment, net"

17  line on its balance sheet.

18        102.    Additionally, WageWorks amortized such costs over the KP Connector's

19  estimated useful life, and reported such periodic amortized costs in the "Amortization and

20  change in contingent consideration" line on its income statement.

21        103.    WageWorks recorded the carrying value of the KP Connector as $3.7 million.

22        104.    As the KP Connector was developed by WageWorks for one specific client, the

23  expected cash flows associated with it were identifiable and independent of the cash flows of

24  WageWorks' other assets and liabilities. Therefore, if events or changes in circumstances

25  indicated that the carrying value of KP Connector may not have been recoverable at a specific

26  point in time, WageWorks was required to perform an impairment test of the carrying value of

27  KP Connector in accordance with ASC 360-10 without considering the fair value or carrying

28  value of any other asset or liability.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

105.     As WageWorks later admitted, but unbeknownst to investors at the time, in the second quarter of 2016, the client informed WageWorks that it no longer required the KP Connector.

106.     Such change in circumstances meant that by June 30, 2016, WageWorks was required to assess the recoverability of the KP Connector by comparing the software's fair value to its carrying value of $3.7 million as of that date.  If its fair value was below its carrying value, WageWorks was required to record the difference between the two as a loss in its income statement for the quarter.

107.     Because the KP Connector was developed for one specific client that no longer required the use of the software, its fair value on June 30, 2016 was $0.

108.     However, Defendants failed to properly record an impairment at that time, and – in WageWorks' 2016 and 2017 financial statements – continued to account for the KP Connector at a carrying value of $3.7 million.

## V.     WageWorks' Lack of Internal Controls

109.     Defendants were able to perpetrate this fraud on the investing public because, among other things, WageWorks' control environment was a complete sham.

110.     Unbeknownst to investors at the time, but now admitted by the Company, WageWorks' internal controls suffered from a host of material weaknesses in 2016 and 2017.

111.     The weakness in WageWorks' control environment started with an improper "tone at the top" set by Defendants.

112.     The complete lack of internal controls at WageWorks – contrary to Defendants' representations to investors and unbeknownst to the market at the time – included, among other things: (a) a lack of processes and controls to ensure the accuracy of financial reporting; (b) insufficient mechanisms for making sure that corrective actions were implemented when necessary; (c) unqualified employees in the finance department who lacked sufficient resources; (d) inadequate risk assessments; (e) lack of oversight in implementing accounting policies; (f) a lack oversight over financial data; (g) absence of documented accounting policies and insufficiently detailed implementation procedures; and (h) a lack of commitment to competency.

113.    The Individual Defendants created a corporate environment that allowed them to perpetrate the accounting fraud in WageWorks' 2016 and 2017 financial statements.

114.    Moreover, the Individual Defendants knew about these material weaknesses in WageWorks' internal controls but falsely stated to the market that they had implemented an effective system of internal controls over financial reporting and effective disclosure controls and procedures.

## VI.    WageWorks Announces a Delay in the Filing of Its 2017 Audited Financial Results, the Existence of a Material Weakness in Its Internal Controls Over Financial Reporting, and the Commencement of an Audit Committee Investigation

115.    On March 1, 2018, during trading hours, Wage Works shocked the market by revealing that it was delaying the filing of its 2017 annual report, its 2017 audited financial results, and its earnings call for the fourth quarter of 2017.  In its press release, WageWorks assured the market that it would provide an update to the market "as soon as practicable."

116.    This news signaled to the market that there were serious issues with WageWorks' prior financial reporting.  The announcement by a public company of a delay in the filing of its year-end audited financial results is highly material information to the market.  It is not a step that a company takes lightly, and it is an indication of potentially significant reporting errors and internal control flaws.

117.    In response to this news, WageWorks' stock lost almost 25% of its value.  That day, March 1, 2018, the stock price closed at $42.70/share, down $9.75/share from its prior closing price of $52.45 on February 28, 2018.

118.    The next day, on March 2, 2018, WageWorks filed a Form 12b-25 Notification of Late Filing with the SEC, providing the reasons for the delay in reporting its financial results. First, WageWorks disclosed that its auditor, KPMG, had not yet signed off on its 2017 financial statements:  "[WageWorks] requires additional time to complete its financial statements and its assessment of the Company's internal control over financial reporting; accordingly, the Company's independent registered accounting firm, [KPMG], has not yet completed its audits of the Company's financial statements and the Company's internal control over financial reporting as of December 31, 2017."

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                                    COMPLAINT

119.    Second, WageWorks disclosed that it had a material weakness in its internal controls over financial reporting, and that it would disclose more details about this material weakness and its plan to remediate the control deficiency when it finally released its 2017 annual report.

120.    WageWorks stated that it "has concluded that it has a material weakness in its internal control over financial reporting as of December 31, 2017 related to managing change and assessing risk in the areas of non-routine and complex transactions. As a result of the material weakness, the Company has concluded that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2017."

121.    Finally, WageWorks disclosed that the Audit Committee of its Board of Directors would be conducting an investigation concerning the accuracy of WageWorks' prior financial statements for 2016 and 2017, its internal controls over financial reporting, and issues concerning a lack of "an open flow of information" and an inappropriate "tone at the top" of the Company.

122.    WageWorks explained that the Audit Committee's review would include an evaluation of the Company's revenue recognition in 2016 in connection with a government contract. The Company disclosed that, "[a]mong other matters, the investigation consists of a review of certain issues, including revenue recognition, related to the accounting for a government contract during fiscal 2016 and associated issues with whether there was an open flow of information and appropriate tone at the top for an effective control environment."

123.    While this information shocked the market, it did not reveal the full truth about the accounting fraud that had been committed by Defendants. As explained below, that information was only slowly and partially leaked into to the market over the course of 2018 and in early 2019.

**VII.    The Audit Committee Announces that WageWorks' Historical Financial Statements Will Have to Be Restated and that the Company's CEO, CFO and General Counsel Are "Resigning"**

124.    The fallout from the Audit Committee's investigation began to be revealed in April 2018, with the announcement by WageWorks that it would have to restate its historical

Case No.                          COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

financial statements and was conducting a serious shakeup of its senior management.

125.    On April 5, 2018, after the markets closed, WageWorks filed a Form 8-K with the SEC attaching a press release.   In the Form 8-K and the accompanying press release, the Company disclosed that, incredibly, its financial statements covering more than a one-year period "should be restated" and "should no longer be relied upon."

126.    In addition, WageWorks stated that the "disclosures related to such financial statements and related communications[,] . . . including management's assessment of internal controls over financial reporting as of December 31, 2016," also should "no longer be relied upon."

127.    The fiscal periods identified by the Company as the "Non-Reliance Periods" were:  the second quarter of 2016, the third quarter of 2016, the full year 2016, the first quarter of 2017, the second quarter of 2017, and the third quarter of 2017.

128.    Based on the investigation conducted by the Audit Committee, WageWorks disclosed the anticipated impacts on its 2016 financial statements:

- An estimated aggregate decrease in revenue in the range of $6.5 million to $9.5 million.

- An estimated aggregate decrease in net income in the range of $3.5 million to $5.5 million.

- An estimated aggregate decrease in adjusted EBITDA in the approximate range of $6 million to $9 million.

129.    However, WageWorks warned that it had "not yet completed its final determination and review," and that "the amounts described above and the periods to which they relate are preliminary and are subject to change."

130.    In the accompanying Form 8-K, WageWorks elaborated:   "There can be no assurance that the final amounts and adjustments will not differ materially from the estimated amounts described above, or that additional adjustments will not be identified, the impact of which may be material."

131.    In addition to disclosing improper recognition of revenue in 2016, WageWorks disclosed that it was ousting its top executives from their senior management positions.

Case No.

COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

132. Defendant Jackson was removed as CEO of the Company – a position he had held for over a decade – but was allowed to stay with the company as Chairman of the Board of Directors through the end of the year.

133. Edgar Montes, WageWorks' President and Chief Operating Officer, was appointed as CEO to replace Jackson, and was also added to WageWorks' Board of Directors.

134. Defendant Callan was removed as CFO of the Company, effective April 5, 2018. The Company did not announce the appointment of a replacement interim CFO until after the close of markets on April 9, 2018.

135. Finally, Kim Wilford resigned as Senior Vice President, General Counsel and Corporate Secretary of WageWorks, effective April 5, 2018.

136. These were not innocent "resignations."  As would subsequently be revealed by WageWorks, these individuals were let go because KPMG – WageWorks' independent auditor – notified the Company that it could no longer rely on the representations of Jackson, Callan and Wilford.

137. In response to the April 5 disclosure, the price of WageWorks' common stock dropped again, down $2.60/share from a closing price of $45.05/share on April 5, 2018, to a closing price of $43.40/share on April 6, 2018, to a closing price of $42.45/share on April 9, 2018.

## VIII.   WageWorks' Independent Auditor Raises Additional Concerns with Management's Integrity and WageWorks Forms a Special Committee to Investigate the Audit Committee's Investigation

138. Although the Audit Committee purportedly completed its investigation of WageWorks' financial statements and internal controls in May 2018, the Company still did not file its annual report for 2017 at that time.  That is because KPMG – WageWorks' independent auditor – refused to sign off on the annual report because of, among other things, serious concerns it had about the integrity of WageWorks' senior management, the lack of information that was being provided to it by the Company, and the reliability of the Audit Committee's investigation.

139. Specifically – as was later (but not contemporaneously) revealed to the market –

- 28 -

in connection with the Audit Committee's investigation, KPMG notified WageWorks that, among other things: (a) it could no longer rely on the representations of Jackson, Callan, or Wilford; (b) WageWorks had improperly recognized revenue for the OPM Contract; and (c) the scope of the Audit Committee investigation should be increased due to the impact of the misstatements identified and its inability to rely on WageWorks internal controls over financial reporting.  In response to some of these concerns, WageWorks made the management changes that it announced on April 5, 2018.

140.    However, KPMG was still concerned with what it was seeing, especially once it found out about infighting and finger-pointing between the executives who were dismissed and the Audit Committee and new management.  In April and May of 2018, counsel for the dismissed executives accused the Audit Committee, the former COO/new CEO, and the Company's corporate counsel of being aware that information was withheld from KPMG in 2017.

141.    When KPMG found out about these allegations in August 2018, it reached out to WageWorks' lead independent director to raise additional concerns about the Audit Committee's investigation.

142.    According to the Company in a subsequent disclosure, KPMG's concerns were "primarily relat[ed] to the Audit Committee's lack of communication with respect to (i) allegations from April through May of 2018 made by former management's counsel following the completion of the Audit Committee's investigation . . . that the Audit Committee, the Company's corporate counsel, and the Company's former COO were aware that information was withheld from the auditors during 2017, and (ii) the response to those allegations."

143.    KPMG recommended that WageWorks take a series of actions to address its concerns.   KPMG's recommendations were described in a November 2018 SEC filing as follows:

- Form[] a special committee of independent directors, excluding any current Audit Committee members, to carry out an independent investigation which would review the initial Audit Committee investigation with full authority to take whatever follow-up measures it deems appropriate, with a view to

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

providing an overall conclusion on all matters within the scope of the initial Audit Committee investigation, inclusive of the allegations made by counsel representing certain members of the Company's former management from April through May 2018;

- Hav[e] such special committee engage an independent law firm to carry out this investigation;

- Hav[e] the investigation specifically address the knowledge and role of the Company's current CEO and each of the audit committee members with regard to the matters that were the subject of the initial Audit Committee investigation, including the allegations made by counsel to certain members of the Company's former management from April through May 2018. In addition, the Special Committee of independent directors was asked to consider the suitability of each of these individuals in their roles as CEO and audit committee members, respectively, based on the results of the investigation, and provide an affirmative conclusion in this regard as to whether or not each individual should be exonerated, as well as any other remedial actions deemed necessary by the Special Committee;

- Hav[e] the investigation specifically address other instances of potential management override of controls, such as the impairment assessment of the Company's KP connector internal use software, which were not identified in the initial Audit Committee investigation but have subsequently been raised in the performance of the 2016 re-audit and completion of the 2017 audit;

- Replac[e] the current Chairman of the Audit Committee; and

- Remov[e] Joseph L. Jackson as Executive Chairman of the Company.

144.    In response to KPMG's recommendations, WageWorks' Board of Directors formed a Special Committee – independent from the Audit Committee – to conduct an independent investigation of the Audit Committee's investigation.

145.    On September 12, 2018, WageWorks stunned the market by announcing the formation of the Special Committee to review the Audit Committee's investigation, as well as the resignation of Jackson and another WageWorks Director: Mariann Byerwalter.

146.    Although at the time the Company attempted to construe Jackson's and Byerwalter's leaving the Board as innocent "resignations," it was later revealed that KPMG had insisted on Jackson's dismissal.  Moreover, Byerwalter had been the Chair of the Audit Committee at the time that WageWorks improperly recognized the revenue from the OPM

Case No.                                    COMPLAINT

1   Contract.

2   147.   In the September 12, 2018 announcement, WageWorks disclosed that KPMG had

3   "certain issues, primarily relating to lack of communication concerning allegations made by

4   former management's counsel following the completion of the Audit Committee's investigation

5   (described elsewhere herein) regarding the Audit Committee's awareness that information was

6   withheld from the auditors during 2016 and 2017, and the response to those allegations," but at

7   the same time sought to downplay the significance of KPMG's concerns, stating that the

8   allegations had been found by counsel to the Audit Committee to be "without merit."

9   148.   Nevertheless, the market understood the significance of KPMG raising additional

10   concerns and the formation of a Special Committee to investigate the Audit Committee.  The

11   Company's accounting and internal control issue were more troubling than had previously been

12   disclosed in March and April of 2018.  Thus, in response to this news, WageWorks' stock price

13   plummeted, losing 17% of its value, down $8.15/share from a closing on September 12, 2018 of

14   $49.10/share to a closing price of $40.95 on September 13, 2018.

15   **IX.   WageWorks Terminates Its Independent Auditor and Discloses Additional
      Accounting Issues**
16

17   149.   On November 6, 2018, WageWorks disclosed to the market that it was

18   terminating KPMG as its independent auditor.

19   150.   The Company stated that it was terminating KPMG because KPMG had not

20   issued "an audit report or provided an audit opinion for the fiscal year ended December 31,

21   2017" and WageWorks wanted to "accelerate the audit process."

22   151.   However, as a result of WageWorks' termination of KPMG for doing its job,

23   WageWorks was forced to disclose the details of KPMG's August 2018 recommendations to

24   WageWorks.

25   152.   These details disclosed yet another accounting issue that was not covered by the

26   Audit Committee's investigation:   WageWorks' failure to record an impairment charge in

27   connection with the "KP connector internal use software."

28   153.   Specifically, WageWorks disclosed that KPMG had recommended in August that

Case No.                                    COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

the Special Committee investigate "other instances of potential management override of controls, such as the impairment assessment of the Company's KP connector internal use software, which were not identified in the initial Audit Committee investigation but have subsequently been raised in the performance of the 2016 re-audit and completion of the 2017 audit."

154.    In response to this news, the price of WageWorks common stock once again fell. On November 6, 2018, the stock closed at a price of $42.78/share.  On November 7, 2018, it closed at a price of $40.89/share, and traded as low as $38.16/share.

## X.    WageWorks Finally Files Its Restated Financial Results

155.    On March 18, 2019, WageWorks finally filed its restated financial statements for 2016 and its audited financial statements for 2017.

156.    Specifically, the Company filed amended Forms 10-Q for the second and third quarters of 2016, and finally filed its Form 10-K for 2017, which contained the restated financials for the full year 2016.

157.    In the 2017 Form 10-K, the Company generally described the 2016 restatement as follows:

> Subsequent to the issuance of the unaudited condensed consolidated financial statements as of September 30, 2017, and as previously disclosed on April 5, 2018, the Board of Directors (the "Board") of WageWorks, Inc. (together with its subsidiaries, "WageWorks," the "Company," "we," "our," or "us") concluded that the Company's financial statements for (i) the quarterly and year-to-date periods ended June 30 and September 30, 2016, (ii) the year ended December 31, 2016 and (iii) the quarterly and year-to-date periods ended March 31, June 30 and September 30, 2017 (collectively, the "Non-Reliance Periods") should be restated and should no longer be relied upon. Further, the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods, including management's assessment of internal control over financial reporting as of December 31, 2016, should also no longer be relied upon. The determination was made upon the recommendation of the audit committee (the "Audit Committee") of the Board as a result of the investigation described below and after consultation with the Company's then independent auditors and management team. The investigation included a review of certain issues, including revenue recognition, related to the accounting for a government contract during fiscal 2016 and associated issues with whether there was an open flow of information and appropriate tone at the top for an effective control environment, the timing of revenue recognition under certain contracts and arrangements, and the impairment assessment for KP Connector,

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No. _____                COMPLAINT

our internal use software, among other matters.

158.   The Company then confirmed that its prior financial statements were materially false and misleading due to, among other things, "accounting and financial reporting errors."

159.   According to the Company, it had committed reporting and accounting errors as a result of improper revenue recognition under the OPM Contract, incorrect "timing and presentation of revenue recognition under certain contracts and arrangements," and failing to record an impairment charge on the KP Connector.

160.   First, WageWorks admitted that in 2016 it had improperly recognized $3.6 million in revenue under the OPM Contract.  The Company conceded that "it should not have recognized revenue related to the OPM professional services, and the related receivable should be reversed."

161.   Second, WageWorks admitted that "starting in Q2 2016, the Company inconsistently applied its policy to net expenses against healthcare revenue which led to an accounting error than impacted healthcare revenue and cost of revenue."  This required the Company to further reduce its revenue for 2016 by a further $5.6 million.

162.   Finally, WageWorks admitted that it had improperly failed to record a $3.7 million impairment charge for the KP Connector in the second quarter of 2016.  The Company described the error as follows:

> In 2016, the Company re-assessed the fair value of KP Connector which is an internal use software developed by the Company based on the specifications outlined in a client agreement.  In the second quarter of 2016, the client notified the Company that it no longer required the services provided by the Company.  Accordingly, the Company determined that KP Connector's carrying value was considered unrecoverable as of June 30, 2016, and recorded a $3.7 million impairment charge to amortization, impairment and change in contingent consideration expense in the consolidated statements of income and a corresponding reduction of property and equipment, net, in the consolidated balance sheets.  The Company also reversed previously recorded amortization expenses in each of the third and fourth quarters of 2016.

163.   The failure by the Company to properly record this impairment charge meant that its reported operating expenses were understated by $3.7 million, which improperly inflated its reported net income by a corresponding amount.

Case No.                                  COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

164.    These accounting and financial reporting errors were both qualitatively and quantitatively material to investors.

165.    The accounting falsehoods relating to the OPM Contract and the KP Connector – alone or in aggregate – had a material impact on WageWorks' financial results.  For example, using WageWorks's historical tax rate of 35%, this false accounting materially inflated WageWorks 2016 adjusted net income that Defendants highlighted to investors by 8.5%, and diluted the corresponding adjusted earnings-per-share ("EPS") by 8.7%.

166.    But for either of these accounting shenanigans, the Company would have fallen below its adjusted EPS guidance for 2016, which would have had significant negative ramifications on WageWorks' stock price.  The Company told investors that in 2016 it expected to generate adjusted EPS of between $1.35 and $1.41 for the full year.  When it released its financial results for year-end 2016, WageWorks reported 2016 adjusted EPS of $1.38, which fell comfortably within the guidance range.  However, had it not improperly recognized revenue under the OPS Contract prior to September 1, 2016, and had it actually recorded an impairment charge on the KP Connector, WageWorks' adjusted EPS would have been no more than $1.26, falling far below the guidance range.

167.    This was true for WageWorks quarterly adjusted EPS guidance too.  For example, in the second quarter of 2016, WageWorks provided adjusted EPS guidance of $0.34-$0.35, and reported at the end of the quarter that it had exceeded that guidance with adjusted EPS of $0.36.  However, had WageWorks not improperly recognized revenue under the OPS Contract in the second quarter, and had it actually recorded an impairment charge on the KP Connector in the second quarter of 2016, the adjusted EPS for the second quarter of 2016 would only have been $0.28, falling well below the guidance range.  And in the third quarter of 2016, the improper revenue recognized under the OPM Contract would have caused WageWorks to fall below its quarterly guidance range of $0.32-$0.33.  Defendants reported adjusted EPS for that quarter of $0.34 when, in fact, adjusted EPS was $0.30 without the improperly recognized revenue under the OPM Contract.

168.    Thus, by improperly recording revenue from the OPM Contract and failing to

Case No.

COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

timely record an impairment charge for the KP Connector, Defendants were able to falsely tell investors that WageWorks had met its guidance range for adjusted EPS during the applicable periods at a time when it was not actually performing in accordance with guidance.

169.    WageWorks also conceded in each of its March 18, 2019 SEC filings that its disclosure controls and procedures and its internal controls over financial reporting were ineffective.  That is, WageWorks had materially flawed internal controls in 2016 and 2017.

170.    WageWorks stated that its disclosure controls and procedures were ineffective because of "unremediated material weaknesses in the Company's internal control over financial reporting."

171.    WageWorks revealed that its internal controls over financial reporting had numerous material weaknesses.  In the 2017 Form 10-K, the Company stated:

> Based on the investigations conducted under the direction of the Audit Committee of the Board, it was concluded that there was an inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from former senior management concerning a complex transaction with the federal government that contributed to an ineffective control environment driven by the tone at the top. Management's failure to timely communicate all pertinent information resulted in an environment which led to an error in the financial statements during the years ended December 31, 2017 and December 31, 2016 and the related interim periods within those years.
>
> In addition, we did not maintain effective internal control over financial reporting related to the following areas: control environment, risk assessment, control activities and monitoring:
>
> • We did not have processes and controls to ensure there were adequate mechanisms and oversight to ensure accountability for the performance of internal control over financial reporting responsibilities and to ensure corrective actions were appropriately prioritized and implemented in a timely manner.
>
> • We did not effectively execute a strategy to attract, develop and retain a sufficient complement of qualified resources with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.
>
> • There was not an adequate assessment of changes in risks by management that could significantly impact internal control over financial reporting or an adequate determination and prioritization of how those risks should be managed.
>
> • We did not have adequate management oversight of accounting and financial reporting activities in implementing certain

Case No.                                    COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

accounting practices to conform to the Company's policies and GAAP.

• We did not have adequate management oversight around completeness and accuracy of data material to financial reporting.

• There was a lack of robust, established and documented accounting policies and insufficiently detailed Company procedures to put these policies into effective action.

• We were not focused on a commitment to competency as it relates to creating priorities, allocating adequate resources and establishing cross functional procedures around managing complex contracts and non-routine transactions as well as managing change and attracting, developing and retaining qualified resources.

172.    WageWorks broke down the deficiencies in its internal controls over financial reporting into five categories of material weaknesses:  (a) accounting close and financial reporting; (b) contract to cash process; (c) risk assessment and management of change; (d) review of new, unusual or significant transactions and contracts; and (e) manual reconciliations of high-volume standard transactions.  The Company described these material weaknesses in detail:

*A. Accounting Close and Financial Reporting*

We had inadequate or ineffective tone at the top and process level and monitoring controls in the area of accounting close and financial reporting specifically, but not exclusively, around the review of account reconciliations, account, account estimates and related cut-off, and monitoring of the accounting close cycle and some areas of related sub-processes such as equity.  We also did not have effective business processes and controls to conduct an effective review of manual data feeds into journal entries for divisions with were not integrated with the main Enterprise Resource Planning system.

We did not have robust, established and documented accounting policies that were implemented effectively, which led to adjustments in areas such as, but not exclusive to Impairment of Internally Developed Software ("IDS") and Unclaimed Liability. As a result of these adjustments the accounts related to amortization of IDS, Fixed Assets and operating expenses as they relate to interest and penalties were impacted.

We also did not have a robust process around managing change and corresponding assessment and implementation of accounting policies. This resulted in a reevaluation of the Accounts Receivable and Customer Obligation Offset Policy of the organization for the financial year 2017.  Furthermore, it also resulted in the delayed assessment and design of controls for the timely implementation of controls around ASC 606 for Revenue Recognition which is effective January 2018.

Case No.                                 COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

These gaps resulted in several adjustments in the financial statement as of the end of the period covered by this report.

*B. Contract to Cash Process*

We did not have effective controls around our contract-to-cash life cycle. The root cause of these gaps were due to inadequate or ineffective process level controls around billing set-up during customer implementation, managing change to existing customer billing terms and conditions, timely termination of customers, implementing complex and/or non-standard billing arrangements which require manual intervention or manual controls for billing to customers, processing timely adjustments, lack of robust, established and documented policies to assess collectability and reserve for revenue, bad debts and accounts receivable, and availability of customer contracts.

These gaps resulted in several adjustments in Revenue, Accounts Receivable, and Accounts Receivable Reserves in the financial statement as of the end of the period covered by this report.

*C. Risk Assessment and Management of Change*

We did not maintain an effective risk assessment and monitoring process to manage the expansion of our existing business. Hence, there were inadequate and ineffective business and financial reporting control activities associated with change and growth in the business. Amongst other areas, the assessment of the control environment and the design of manual controls around financial system implementations, such as NetSuite, was not performed adequately in 2017.

As a result, the Company did not properly estimate and record certain transactions which resulted in errors in the consolidated financial statements as of the end of the periods covered by this report

*D. Review of New, Unusual or Significant Transactions and Contracts*

We did not have adequate risk assessment controls to continuously formally assess the financial reporting risks associated with executing new, significant or unusual transactions, contracts or business initiatives. As a result, the Company did not adequately identify and analyze changes in the business and hence implement effective process level controls and monitoring controls that were responsive to these changes and aligned with financial reporting objectives. This failure to identify and analyze changes occurred in connection with the integration of acquisitions and the monitoring and recording of certain revenues associated with a complex government contract. As a result, the Company did not properly account for certain transactions including Revenue and Customer Obligation Accounts, which resulted in errors in the financial statement as of the end of the period covered by this report.

*E. Manual Reconciliations of High-Volume Standard Transactions*

We did not have effective business processes and controls as well as

- 37 -

resources with adequate training and support to conduct an effective review of manual reconciliations including the complex data feeds into the reconciliations of high-volume standard transactions. This resulted in several errors mainly to balance sheet classifications around Accounts Receivable, Customer Obligations and other related accounts as of the end of the period covered by this report.

173.   WageWorks' new auditor – BDO USA, LLP ("BDO") – confirmed that WageWorks' internal controls over financial reporting contained material weaknesses through the end of 2017.

174.   In its audit opinion, BDO stated that WageWorks "did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2017."

175.   BDO expounded:

Several material weaknesses regarding management's failure to design and maintain controls have been identified and described in management's assessment. The material weaknesses related to 1) the control environment, due to material weaknesses related to a) an inconsistent and sometimes inappropriate tone at the top was present under the then existing senior management, b) an insufficient complement of qualified resources with an appropriate level of knowledge, experience and training important to the Company's financial reporting requirements, c) inadequate mechanisms and oversight to ensure accountability for the performance of controls; 2) risk assessment, as the Company did not have an adequate assessment of changes in risks by management that could significantly impact internal control over financial reporting and did not effectively design controls in response to the risks of material misstatement; 3) control activities and information and communication, specifically between the accounting department and other operating departments necessary to support the proper functioning of internal controls; and 4) monitoring controls, as the Company did not maintain an internal audit function sufficient to monitor control activities. The control environment material weaknesses contributed to additional material weaknesses in the control activities of the Company as the Company did not design and maintain effective controls over a) accounting close and financial reporting; b) contract to cash process, c) risk assessment and management of change, as well as the review, approval, and documentation related to the application of generally accepted accounting principles, d) review of new, unusual or significant transactions and contracts, and e) manual reconciliations of high-volume standard transactions. The risk assessment material weakness contributed to an additional material weakness as the Company did not design effective controls over certain business processes, including controls over the preparation, analysis, and review of closing adjustments required to assess the appropriateness of certain account balances at period end.

176.   WageWorks identified in its March 18, 2019 SEC filings that it had been and was

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 38 -

continuing to implement various measures to remediate the material weaknesses in its internal controls over financial reporting.  The Company described those remediation efforts as follows:

> To address the material weaknesses in our internal control over financial reporting, in addition to the specific remediations noted under each sub-section, the Company has and is in the process of taking the following measures:
>
> - The Company has undergone a leadership transition, and we have a new Chief Executive Officer, Chief Financial Officer and General Counsel. Clear lines of responsibilities have been drawn in new roles to ensure effective controls.
>
> - We are establishing regular working group meetings, with appropriate oversight by the Audit Committee and leadership of the Company, to strengthen accountability for performance of internal control over financial reporting responsibilities and prioritization of corrective actions.
>
> - We will be enhancing our compensation practices to further incorporate risk and operational goals.
>
> - We will be assessing and enhancing adequacy and quality of resources in areas impacting financial reporting including, but not limited to conducting additional training programs for our employees to enhance their skill sets which will complement their work.
>
> - We are augmenting accounting staff with additional technical expertise in GAAP to assist with enhanced financial reporting procedures, controls and remediation efforts.
>
> To address the material weakness in the *Accounting Close and Financial Reporting* area (Material Weakness A., noted above), the Company has taken the following measures:
>
> - We are establishing senior level oversight and executive reporting around the accounting close and financial reporting process with an enhanced focus on improving process level controls to strengthen the existing control environment around formalizing and documenting accounting policies as well as implementing a robust accounting close process with enhanced review of financial statements.
>
> - In addition to enhancing processes and controls over adoption of new accounting standards, we will also be enhancing GAAP expertise within the accounting department.
>
> To address the material weakness in the *Contract to Cash Process* (Material Weakness B., noted above), the Company has taken the following measures:
>
> - We are establishing senior level oversight and executive reporting around the contract to cash process with an enhanced

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                              COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1
2
3
4

focus on improving process level controls to strengthen the existing control environment around the contract to cash process and revenue recognition. This includes but is not limited to enhancing the process for record retention of contracts and agreements, assessment of collectability from customers, analysis of complex contracts as well as automation of select billing processes.

5
6

To address the material weakness in the *Risk Assessment and Change Management Process* (Material Weakness C., noted above), the Company has taken the following measures:

7
8
9

- We are developing a plan to implement a periodic risk assessment process, review of control procedures and documentation around impact of changes on accounting processes.

10
11

- We are developing a plan to enhance documentation and review around accounting estimates, and interpretations with formal approval of the detailed review.

12
13

- We are developing a plan to proactively design manual controls around implementation of new systems impacting financial reporting.

14
15

- We have reallocated Company resources to improve the oversight over operational changes across the business and business trends.

16
17

To address the material weakness in the *Review of New, Unusual or Significant Transactions and Contracts* (Material Weakness D., noted above), the Company is in process of strengthening its processes and controls as follows:

18
19
20
21
22

- We are designing and implementing enhanced internal controls surrounding identification, analysis and governance and monitoring of new, significant or unusual contracts or transactions to ensure that these contracts or transactions are recorded in accordance with Company's policies and GAAP. This will entail enhanced documentation of analysis, as well as review and cross functional approval of company policies and interpretations.

23
24

To address the material weakness in the *Manual Reconciliations of High-Volume Standard Transactions* (Material Weakness E, noted above), the Company has taken the following measures:

25

- We are providing leadership oversight to ensure prioritization of funding and resources for the remediation efforts.

26
27
28

- We are strengthening the review controls and supporting documentation related to reconciliations of high-volume standard transactions. With an enhanced focus on supporting documentation review, we are implementing a comprehensive review methodology over data, inputs and reports used for the

- 40 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

reconciliations.

177.   On April 26, 2019, WageWorks filed its amended Form 10-K for 2016, and its amended Forms 10-Q for the first, second, and third quarters of 2017.  In its amended Form 10-Qs, WageWorks was forced to reduce amounts previously carried as accounts receivable on its balance sheet relating to the revenue recognized under the OPM Contract, which inflated reported accounts receivable by at least $5.1 million.

178.   On June 26, 2019, WageWorks entered into an Agreement and Plan of Merger pursuant to which it agreed to be acquired by HealthEquity, Inc.  The acquisition was completed on August 30, 2019.  Upon the consummation of the merger, WageWorks ceased being a public company.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### I.     Defendants Materially Misstate WageWorks' Financial Results

179.   On August 9, 2016, WageWorks publicly disclosed its financial results for the second quarter of 2016.   The accompanying press release ("2016 Second Quarter Earnings Announcement") stated in pertinent part:

- Total revenue in the second quarter 2016 of $87.7 million

- Second quarter 2016 GAAP net income of $2.9 million or $0.08 per diluted share, Non-GAAP net income of $13.3 million or $0.36 per diluted share

- Second quarter 2016 non-GAAP adjusted EBITDA of $27.5 million, a 24 percent increase year-over-year

. . .

"The first half of 2016 was another strong one for WageWorks . . . ," said Joe Jackson, Chief Executive Officer of WageWorks.

For the second quarter, WageWorks reported total revenue of $87.7 million, compared to $82.8 million for the second quarter of 2015, an increase of 6 percent. Healthcare revenue was $48.1 million, compared to $43.8 million for the second quarter of 2015, an increase of 10 percent. . . .

. . .

GAAP operating income was $4.6 million for the second quarter of 2016, compared to GAAP operating income of $6.8 million for the second quarter of 2015. On a non-GAAP basis, second quarter of

- 41 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

2016 operating income was $22.3 million, an increase compared to non-GAAP operating income of $17.5 million for the second quarter of 2015.

GAAP net income was $2.9 million, or $0.08 per diluted share, for the second quarter of 2016, compared to GAAP net income of $3.5 million, or $0.10 per diluted share, for the second quarter of 2015.

On a non-GAAP net income basis, second quarter of 2016 net income was $13.3 million, or $0.36 per diluted share, an increase compared to non-GAAP net income of $10.3 million, or $0.28 per diluted share, for the second quarter of 2015. Non- GAAP net income for the second quarter of 2015 and 2016 excludes expenses related to stock-based compensation, amortization of acquired intangibles, contingent consideration expense, severance costs related to integration initiatives and the related tax impact of these items.

180.    That same day, WageWorks filed its 2016 Second Quarter Report with the SEC, which provided the Company's second quarter 2016 financial results, including the GAAP quarterly revenue, net income, and earnings per share figures disclosed in the 2016 Second Quarter Earnings Announcement.

181.    The revenues, net income, and EPS reported in the 2016 Second Quarter Earnings Announcement and the 2016 Second Quarter Report were materially overstated, thereby causing WageWorks' common stock to trade at artificially inflated prices.  As WageWorks has now admitted in its amended Form 10-Q for the second quarter of 2016, filed with the SEC on March 18, 2019 ("Amended 2016 Second Quarter Report"), Defendants improperly recognized revenue of $1.1 million from the OPM Contract that should never have been recognized in the second quarter of 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector in the second quarter of 2016.  This fraudulent accounting caused WageWorks to falsely inflate its publicly reported revenues, net income and EPS.

182.    On November 9, 2016, WageWorks publicly disclosed its financial results for the third quarter of 2016.   The accompanying press release ("2016 Third Quarter Earnings Announcement") stated in pertinent part:

- Total revenue in the third quarter 2016 of $88.9 million

- Third quarter 2016 GAAP net income of $5.9 million or $0.16 per diluted share, Non- GAAP net income of $12.6 million or $0.34 per diluted share

Case No.                                    COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

. . .

- Third quarter 2016 non-GAAP adjusted EBITDA of $26.5 million

. . .

"I am very pleased with our strong third quarter results.   We are in the midst of another record setting new sales year driven by increased interest across all of our products from employers of all sizes. The successful transition of the existing participants on the United States Office of Personnel Management's Federal Flexible Spending Account Program to our platform marks the largest transition of accounts in our history," said Joe Jackson, Chief Executive Officer of WageWorks.

. . .

For the third quarter, WageWorks reported total revenue of $88.9 million, compared to $83.2 million for the third quarter of 2015, an increase of 7 percent. Healthcare revenue was $48.5 million, compared to $42.2 million for the third quarter of 2015, an increase of 15 percent.

. . .

GAAP operating income was $9.4 million for the third quarter of 2016, compared to GAAP operating income of $12.7 million for the third quarter of 2015. On a non- GAAP basis, third quarter of 2016 operating income was $21.3 million, compared to non-GAAP operating income of $21.9 million for the third quarter of 2015.

. . .

GAAP net income was $5.9 million, or $0.16 per diluted share, for the third quarter of 2016, compared to GAAP net income of $7.6 million, or $0.21 per diluted share, for the third quarter of 2015.

. . .

On a non-GAAP basis, third quarter of 2016 net income was $12.6 million, or $0.34 per diluted share, compared to non-GAAP net income of $13.0 million, or $0.36 per diluted share, for the third quarter of 2015. Non-GAAP net income for the third quarter of 2015 and 2016 excludes expenses related to stock-based compensation, amortization of acquired intangibles, contingent consideration expense, severance costs related to integration initiatives, costs associated with the planned acquisition of ADP's Consumer Health Spending Account and COBRA businesses, and the related tax impact of these items.

183. That same day, WageWorks filed its 2016 Third Quarter Report with the SEC, which provided the Company's third quarter 2016 financial results, including the GAAP

- 43 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1   quarterly revenue, net income, and earnings per share figures disclosed in the 2016 Third Quarter

2   Earnings Announcement.

3          184.    The revenues, net income, and EPS reported in the 2016 Third Quarter Earnings

4   Announcement and the 2016 Third Quarter Report were materially overstated, thereby causing

5   WageWorks' common stock to trade at artificially inflated prices.  As WageWorks has now

6   admitted in its amended Form 10-Q for the third quarter of 2016, filed with the SEC on

7   March 18, 2019 ("Amended 2016 Third Quarter Report"), Defendants improperly recognized

8   revenue of $2.3 million from the OPM Contract that should never have been recognized in the

9   third quarter of 2016, and also improperly failed to record a $3.7 million impairment charge with

10  respect to the KP Connector for the nine months ended September 30, 2016.  This fraudulent

11  accounting caused WageWorks to falsely inflate its publicly reported revenues, net income and

12  EPS.

13         185.    On February 23, 2017, WageWorks publicly disclosed its financial results for the

14  quarter and the year ending December 31, 2016.  The accompanying press release ("2016 Annual

15  Earnings Announcement") stated in pertinent part:

16         •   Full year 2016 total revenue of $364.7 million

17         •   Full year 2016 GAAP net income of $20.2 million or $0.54 per
18             diluted share, Non-GAAP net income of $51.3 million or $1.38
               per diluted share

19         . . .

20         "2016 was an outstanding year for WageWorks.  Our sales team
           delivered another record performance and we just completed a
21         successful open enrollment season that included on boarding the
           largest number of participants in our history. . . .  We continue to see
22         positive momentum in all aspects of our business and enter 2017 well
           positioned to execute on the foundation that we built in 2016," said Joe
23         Jackson, Chief Executive Officer of WageWorks.

24         . . .

25         **Full Year 2016 Financial Highlights**

26         For the full year of 2016, WageWorks reported total revenue of $364.7
           million, compared to $334.3 million for the full year of 2015, an
27         increase of nine percent.  Healthcare revenue was $202.9 million,
           compared to $176.6 million for the full year of 2015, an increase of 15
28         percent.

- 44 -

Case No.                                    COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

GAAP operating income was $32.7 million for the full year of 2016, compared to GAAP operating income of $39.9 million for the full year of 2015. On a non-GAAP basis, full year of 2016 operating income was $86.0 million, compared to non- GAAP operating income of $78.2 million for the full year of 2015.

GAAP net income was $20.2 million, or $0.54 per diluted share, for the full year of 2016, compared to GAAP net income of $23.0 million, or $0.63 per diluted share, for the full year of 2015.

On a non-GAAP basis, full year 2016 net income was $51.3 million, or $1.38 per diluted share, compared to non-GAAP net income of $45.8 million, or $1.25 per diluted share, for the full year of 2015. Non-GAAP net income for the full year of 2015 and 2016 excludes expenses related to stock-based compensation, amortization of acquired intangibles, employee termination and other charges, contingent consideration expense, and the related tax impact of these items.

. . .

As of December 31, 2016, WageWorks had cash and cash equivalents totaling $678.3 million. This compares to cash and cash equivalents totaling $500.9 million as of December 31, 2015.

186.    That same day, WageWorks filed its 2016 Annual Report with the SEC, which provided the Company's full year 2016 financial results, including the GAAP quarterly revenue, net income, and earnings per share figures disclosed in the 2016 Annual Earnings Announcement.

187.    The revenues, net income, and EPS reported in the 2016 Annual Earnings Announcement and the 2016 Annual Report were materially overstated, thereby causing WageWorks' common stock to trade at artificially inflated prices.  As WageWorks has now admitted in its amended Form 10-K for 2016, filed with the SEC on April 26, 2019 ("Amended 2016 Annual Report"), Defendants improperly recognized revenue of $3.6 million from the OPM Contract that should never have been recognized in 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector in 2016.  This fraudulent accounting caused WageWorks to falsely inflate its publicly reported revenues, net income and EPS.

188.    On May 4, 2017, WageWorks publicly disclosed its financial results for the first quarter of 2017 and filed its 2017 First Quarter Report with the SEC.  In the 2017 First Quarter

Report, WageWorks carried as accounts receivable on its balance sheet the amount of false revenue it had recorded in connection with the OPM Contract, inflating reported accounts receivable by at least $5.1 million. As the Company has now admitted in its amended Form 10-Q for the first quarter of 2017, filed with the SEC on April 26, 2019 ("Amended 2017 First Quarter Report"), this was a material misstatement of WageWorks' financial condition at the time, which caused WageWorks' common stock to trade at artificially inflated prices.

189. On June 19, 2017, WageWorks announced a public offering of almost 3 million shares of common stock. That same day, WageWorks filed a Registration Statement and Prospectus for the offering with the SEC on Form S-3. The Registration Statement was signed by, among others, Defendants Jackson and Callan. The next day, June 20, 2017, WageWorks filed with the SEC a Prospectus Supplement to the Prospectus. The Registration Statement, Prospectus, and Prospectus Supplement (the "2017 Offering Materials") each incorporated by reference the information set forth in the 2016 Annual Report and the 2017 First Quarter Report, which were materially false and misleading for the reasons set forth above.

190. On August 1, 2017, WageWorks publicly disclosed its financial results for the second quarter of 2017 and filed its 2017 Second Quarter Report with the SEC. In the 2017 Second Quarter Report, WageWorks carried as accounts receivable on its balance sheet the amount of false revenue it had recorded in connection with the OPM Contract, inflating reported accounts receivable by at least $5.1 million. As the Company has now admitted in its amended Form 10-Q for the second quarter of 2017, filed with the SEC on April 26, 2019 ("Amended 2017 Second Quarter Report"), this was a material misstatement of WageWorks' financial condition at the time, which caused WageWorks' common stock to trade at artificially inflated prices.

191. On November 8, 2017, WageWorks publicly disclosed its financial results for the third quarter of 2017 and filed its 2017 Third Quarter Report with the SEC. In the 2017 Third Quarter Report, WageWorks carried as accounts receivable on its balance sheet the amount of false revenue it had recorded in connection with the OPM Contract, inflating reported accounts receivable by at least $5.1 million. As the Company has now admitted in its amended Form 10-

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Q for the third quarter of 2017, filed with the SEC on April 26, 2019 ("Amended 2017 Third Quarter Report"), this was a material misstatement of WageWorks' financial condition at the time, which caused WageWorks' common stock to trade at artificially inflated prices.

**II.     Defendants Misrepresent WageWorks' Compliance with U.S. GAAP and Falsely Certify the Accuracy of Its Periodic Reports**

192.    In WageWorks' 2016 Annual Report, the Company stated that the financial information contained therein was reported in accordance with U.S. GAAP, that revenue was recognized only when earned, and that it properly assessed and recorded impairment charges on long-lived assets:

> Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles, or GAAP.
>
> . . .
>
> We report revenue for the following product offerings: healthcare, commuter, COBRA and other services. Our revenues are primarily attributable to fees for services we provide to employer clients.
>
> Healthcare and commuter programs generate revenues from the monthly services we provide in connection with their employees' participation in CDB accounts. COBRA revenue is generated from the administration of continuation of coverage services for participants who are no longer eligible for the employer's health benefits. Other revenue includes services related to enrollment and eligibility, non-healthcare, employee account administration (i.e., tuition and health club reimbursements) and project-related professional fees. Fees associated with services are recognized in the period services are rendered and earned in accordance with service arrangements with clients where fees are fixed or determinable and collectability is reasonably assured.
>
> . . .
>
> The Company reviews long-lived assets for indicators of impairment whenever events or changes in circumstances indicate that the carrying amounts of such assets may not be recoverable. Long-lived assets consist primarily of software development costs, office equipment, leasehold improvements and definite-lived assets. An impairment of long-lived assets exists when the carrying amount of a long-lived asset group, exceeds its fair value. Impairment losses are recorded when the carrying amount of the impaired asset group is not recoverable. Recoverability is determined by comparing the carrying amount of the asset or asset group to the undiscounted cash flows which are expected to be generated from its use. If the carrying amount of the asset group exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset or

- 47 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

asset group exceeds its fair value.

193.   In each of WageWorks' 2016 Second Quarter Report, 2016 Third Quarter Report, 2017 First Quarter Report, 2017 Second Quarter Report, and 2017 Third Quarter Report, Defendants similarly reported that the financial information contained therein was reported in accordance with U.S. GAAP.

194.   These statements, which caused WageWorks' common stock to trade at artificially inflated prices, were materially false and misleading because WageWorks did not prepare its financials in accordance with U.S. GAAP, and did not comply with its stated accounting policies governing revenue recognition and the impairment of long-lived assets.  As WageWorks has now admitted in its amended SEC filings:   (a) Defendants improperly recognized revenue of $1.1 million from the OPM Contract that should never have been recognized in the second quarter of 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector in the second quarter of 2016; (b) Defendants improperly recognized revenue of $2.3 million from the OPM Contract that should never have been recognized in the third quarter of 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector for the nine months ended September 30, 2016; (c) Defendants improperly recognized revenue of $3.6 million from the OPM Contract that should never have been recognized in 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector in 2016; and (d) WageWorks carried as accounts receivable on its balance sheet the amount of false revenue it had recorded in connection with the OPM Contract, inflating reported accounts receivable by at least $5.1 million, in the first, second, and third quarters of 2017.

195.   With each of WageWorks' 2016 Second Quarter Report, 2016 Third Quarter Report, 2016 Annual Report, 2017 First Quarter Report, 2017 Second Quarter Report, and 2017 Third Quarter Report, Defendants Jackson and Callan signed a Section 906 Certification attesting that the information contained in those reports "fairly presents, in all material respects, the financial condition and results of operations of the Company."

196.   Each of these Section 906 Certifications, which caused WageWorks' common

stock to trade at artificially inflated prices, was materially false and misleading because as WageWorks has now admitted in its amended SEC filings:   (a) Defendants improperly recognized revenue of $1.1 million from the OPM Contract that should never have been recognized in the second quarter of 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector in the second quarter of 2016; (b) Defendants improperly recognized revenue of $2.3 million from the OPM Contract that should never have been recognized in the third quarter of 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector for the nine months ended September 30, 2016; (c) Defendants improperly recognized revenue of $3.6 million from the OPM Contract that should never have been recognized in 2016, and also improperly failed to record a $3.7 million impairment charge with respect to the KP Connector in 2016; and (d) WageWorks carried as accounts receivable on its balance sheet the amount of false revenue it had recorded in connection with the OPM Contract, inflating reported accounts receivable by at least $5.1 million, in the first, second, and third quarters of 2017.

## III.   Misrepresentations Concerning Effectiveness of Internal Controls

197.   Defendants repeatedly certified that they had established effective internal controls over WageWorks' financial reporting as well as effective disclosure controls and procedures for WageWorks.

198.   For example, in the 2016 Annual Report, Defendants disclosed:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act"), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.   In designing and evaluating our disclosure controls and procedures, management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Subject to the limitations noted above, based on their evaluation at the end of the period covered by this Annual Report on Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures and have concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act. The Company's internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.   Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In making its assessment of internal control over financial reporting, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) on Internal Control - Integrated Framework (2013). . . .   Based on this assessment, our CEO and CFO concluded that our internal control over financial reporting was effective as of December 31, 2016.

. . .

**Changes in Internal Control Over Financial Reporting**

There was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

1

2

3

15(d) or the Exchange Act that occurred during the period covered by this Annual Report on Form 10-K that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

199.    WageWorks made substantially similar internal control disclosures in its 2016 First Quarter Report, 2016 Second Quarter Report, 2016 Third Quarter Report, 2017 First Quarter Report, 2017 Second Quarter Report, and 2017 Third Quarter Report, affirmatively stating that WageWorks had effective internal controls over financial reporting and disclosure controls and procedures during the relevant period, and that there had been no material changes in WageWorks' internal controls since the prior reporting period.

200.    Along with the 2016 Annual Report, Defendants Jackson and Callan provided a certification, pursuant to Section 302 of SOX, concerning WageWorks' internal controls.  Each of Jackson and Callan certified:

1.    I have reviewed this Annual Report on Form 10-K of WageWorks, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 51 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

201.    Defendants Jackson and Callan provided substantially identical certifications pursuant to Section 302 of SOX for the relevant periods with WageWorks' 2016 First Quarter Report, 2016 Second Quarter Report, 2016 Third Quarter Report, 2017 First Quarter Report, 2017 Second Quarter Report, and 2017 Third Quarter Report.

202.    These statements, which caused WageWorks' common stock to trade at artificially inflated prices, were materially false and misleading because WageWorks did not have effective internal controls over financial reporting and effective disclosure controls and procedures in 2016 and 2017.

203.    Indeed, any internal controls that WageWorks did have in place were woefully deficient to prevent Defendants committing the accounting fraud that they perpetrated.   As WageWorks admitted in its 2017 Annual Report filed on March 18, 2019:

Based on the investigations conducted under the direction of the Audit Committee of the Board, it was concluded that there was an inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from former senior management concerning a complex transaction with the federal government that contributed to an ineffective control environment

- 52 -

driven by the tone at the top.  Management's failure to timely communicate all pertinent information resulted in an environment which led to an error in the financial statements during the years ended December 31, 2017 and December 31, 2016 and the related interim periods within those years.

In addition, we did not maintain effective internal control over financial reporting related to the following areas: control environment, risk assessment, control activities and monitoring:

- We did not have processes and controls to ensure there were adequate mechanisms and oversight to ensure accountability for the performance of internal control over financial reporting responsibilities and to ensure corrective actions were appropriately prioritized and implemented in a timely manner.

- We did not effectively execute a strategy to attract, develop and retain a sufficient complement of qualified resources with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.

- There was not an adequate assessment of changes in risks by management that could significantly impact internal control over financial reporting or an adequate determination and prioritization of how those risks should be managed.

- We did not have adequate management oversight of accounting and financial reporting activities in implementing certain accounting practices to conform to the Company's policies and GAAP.

- We did not have adequate management oversight around completeness and accuracy of data material to financial reporting.

- There was a lack of robust, established and documented accounting policies and insufficiently detailed Company procedures to put these policies into effective action.

- We were not focused on a commitment to competency as it relates to creating priorities, allocating adequate resources and establishing cross functional procedures around managing complex contracts and non-routine transactions as well as managing change and attracting, developing and retaining qualified resources.

204.    There were five categories of material weaknesses in WageWorks' internal controls over financial reporting:  (a) accounting close and financial reporting; (b) contract to cash process; (c) risk assessment and management of change; (d) review of new, unusual or significant transactions and contracts; and (e) manual reconciliations of high-volume standard transactions.  In its 2017 Annual Report, WageWorks described the details of these material

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                          COMPLAINT

weaknesses:

### A. Accounting Close and Financial Reporting

We had inadequate or ineffective tone at the top and process level and monitoring controls in the area of accounting close and financial reporting specifically, but not exclusively, around the review of account reconciliations, account, account estimates and related cut-off, and monitoring of the accounting close cycle and some areas of related sub-processes such as equity. We also did not have effective business processes and controls to conduct an effective review of manual data feeds into journal entries for divisions with were not integrated with the main Enterprise Resource Planning system.

We did not have robust, established and documented accounting policies that were implemented effectively, which led to adjustments in areas such as, but not exclusive to Impairment of Internally Developed Software ("IDS") and Unclaimed Liability. As a result of these adjustments the accounts related to amortization of IDS, Fixed Assets and operating expenses as they relate to interest and penalties were impacted.

We also did not have a robust process around managing change and corresponding assessment and implementation of accounting policies. This resulted in a reevaluation of the Accounts Receivable and Customer Obligation Offset Policy of the organization for the financial year 2017. Furthermore, it also resulted in the delayed assessment and design of controls for the timely implementation of controls around ASC 606 for Revenue Recognition which is effective January 2018. These gaps resulted in several adjustments in the financial statement as of the end of the period covered by this report.

### B. Contract to Cash Process

We did not have effective controls around our contract-to-cash life cycle. The root cause of these gaps were due to inadequate or ineffective process level controls around billing set-up during customer implementation, managing change to existing customer billing terms and conditions, timely termination of customers, implementing complex and/or non-standard billing arrangements which require manual intervention or manual controls for billing to customers, processing timely adjustments, lack of robust, established and documented policies to assess collectability and reserve for revenue, bad debts and accounts receivable, and availability of customer contracts.

These gaps resulted in several adjustments in Revenue, Accounts Receivable, and Accounts Receivable Reserves in the financial statement as of the end of the period covered by this report.

### C. Risk Assessment and Management of Change

We did not maintain an effective risk assessment and monitoring process to manage the expansion of our existing business. Hence, there were inadequate and ineffective business and financial reporting

Case No.                          COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

control activities associated with change and growth in the business. Amongst other areas, the assessment of the control environment and the design of manual controls around financial system implementations, such as NetSuite, was not performed adequately in 2017.

As a result, the Company did not properly estimate and record certain transactions which resulted in errors in the consolidated financial statements as of the end of the periods covered by this report

*D. Review of New, Unusual or Significant Transactions and Contracts*

We did not have adequate risk assessment controls to continuously formally assess the financial reporting risks associated with executing new, significant or unusual transactions, contracts or business initiatives. As a result, the Company did not adequately identify and analyze changes in the business and hence implement effective process level controls and monitoring controls that were responsive to these changes and aligned with financial reporting objectives. This failure to identify and analyze changes occurred in connection with the integration of acquisitions and the monitoring and recording of certain revenues associated with a complex government contract. As a result, the Company did not properly account for certain transactions including Revenue and Customer Obligation Accounts, which resulted in errors in the financial statement as of the end of the period covered by this report.

*E. Manual Reconciliations of High-Volume Standard Transactions*

We did not have effective business processes and controls as well as resources with adequate training and support to conduct an effective review of manual reconciliations including the complex data feeds into the reconciliations of high-volume standard transactions. This resulted in several errors mainly to balance sheet classifications around Accounts Receivable, Customer Obligations and other related accounts as of the end of the period covered by this report.

205. BDO confirmed that WageWorks' internal controls over financial reporting contained material weaknesses through the end of 2017.

206. In its audit opinion of WageWorks' 2017 Annual Report, BDO stated that WageWorks "did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2017."

207. According to BDO:

Several material weaknesses regarding management's failure to design and maintain controls have been identified and described in management's assessment. The material weaknesses related to 1) the control environment, due to material weaknesses related to a) an inconsistent and sometimes inappropriate tone at the top was present under the then existing senior management, b) an insufficient

complement of qualified resources with an appropriate level of knowledge, experience and training important to the Company's financial reporting requirements, c) inadequate mechanisms and oversight to ensure accountability for the performance of controls; 2) risk assessment, as the Company did not have an adequate assessment of changes in risks by management that could significantly impact internal control over financial reporting and did not effectively design controls in response to the risks of material misstatement; 3) control activities and information and communication, specifically between the accounting department and other operating departments necessary to support the proper functioning of internal controls; and 4) monitoring controls, as the Company did not maintain an internal audit function sufficient to monitor control activities.    The control environment material weaknesses contributed to additional material weaknesses in the control activities of the Company as the Company did not design and maintain effective controls over a) accounting close and financial reporting; b) contract to cash process, c) risk assessment and management of change, as well as the review, approval, and documentation related to the application of generally accepted accounting principles, d) review of new, unusual or significant transactions and contracts, and e) manual reconciliations of high-volume standard transactions.  The risk assessment material weakness contributed to an additional material weakness as the Company did not design effective controls over certain business processes, including controls over the preparation, analysis, and review of closing adjustments required to assess the appropriateness of certain account balances at period end.

## SUMMARY OF DEFENDANTS' SCIENTER

208.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

209.    Defendants Jackson and Callan acted with scienter with respect to the materially false and misleading statements of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made.  As the most senior executives of WageWorks during the relevant time period, their scienter is imputable to WageWorks.

210.    According to the SEC Cease-and-Desist Order, Defendants Jackson and Callan knew in March 2016 that OPM had indicated that it would not pay WageWorks for any work performed under the OPM Contract prior to September 1, 2016.  Despite knowing OPM's position, Jackson and Callan intentionally concealed this information from WageWorks' accounting staff and its independent auditor in order to make sure that WageWorks improperly recognized the revenue.

211.    WageWorks' new management and its Audit Committee have placed the blame squarely at the feet of Jackson and Callan for the improper revenue recognition in connection with the OPM Contract, the failure to record an impairment charge against the KP Connector, and the utter lack of internal controls at the Company.

212.    Indeed, when the 2017 Annual Report was finally filed in March 2019, WageWorks disclosed that "there was an *inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from former senior management* concerning a complex transaction with the federal government that contributed to *an ineffective control environment driven by the tone at the top*."  At the time of the filing of the 2017 Annual Report, the "former senior management" included Jackson and Callan.

213.    WageWorks further identified Jackson's and Callan's "failure to timely communicate all pertinent information" as creating an "environment" that "led to an error in the financial statements during the years ended December 31, 2017 and December 31, 2016 and the related interim periods within those years."  Thus, Jackson and Callan possessed information that, had it been communicated, would have indicated that WageWorks' financial reporting was false.  The fact that they withheld that information demonstrates an intention to mislead.

214.    WageWorks conceded in its restatement that it "did not maintain effective internal control over financial reporting related to . . . control environment, risk assessment, control activities and monitoring."  In 2016 and 2017, Jackson and Callan were the individuals at WageWorks responsible for designing and evaluating WageWorks' internal control framework, and they were well aware that they created this improper "tone at the top" and failed to disseminate relevant information that "contributed to an ineffective control environment."

215.    Jackson and Callan were forced to resign from their senior management positions at WageWorks as a result of the accounting fraud for which they were responsible and the toxic control environment that they created.  Their "resignations" were announced in the same April 5, 2018 press release that warned that the Company's financial statements from 2016 and 2017 would have to be restated and should no longer be relied upon, and that reiterated that the Audit Committee's investigation was focusing on "whether there was an open flow of information and

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 57 -

appropriate tone at the top for an effective control environment."  The disclosure of their "resignations" in the same press release that announced that the Company's financial information would have to be restated further corroborates that Jackson and Callan were responsible for failing to communicate key information with the intent to mislead.  Moreover, the SEC Cease-and-Desist Order confirms that Jackson's and Callan's resignations were related to the fraudulent accounting.

216.    Although Jackson initially stayed on WageWorks' Board, he was soon removed from the Company entirely just a few months later and at the request and recommendation of the Company's independent auditor.

217.    Indeed, the unusual conduct of KPMG as independent auditor removes any doubt that Jackson and Callan acted with scienter.  KPMG repeatedly and stridently expressed concern about the conduct of those executives, and called for their resignations.

218.    KPMG refused to sign off on WageWorks' 2017 annual report after it developed serious concerns about the integrity of Jackson and Callan, the lack of information that was being provided to it by Jackson and Callan, and the reliability of the Audit Committee's initial investigation.

219.    In connection with the Audit Committee's investigation, KPMG notified WageWorks that, among other things: (a) it could no longer rely on the representations of Jackson or Callan; (b) WageWorks had improperly recognized revenue for the OPM Contract; and (c) the scope of the Audit Committee investigation should be increased due to the impact of the misstatements identified and its inability to rely on WageWorks' internal controls over financial reporting.  In response to some of these concerns, Jackson and Callan were removed as CEO and CFO of WageWorks.

220.    In April and May of 2018, counsel for the dismissed executives accused the Audit Committee, the new CEO, and the Company's corporate counsel of being aware that information was withheld from KPMG in 2017.  The new CEO was formerly WageWorks' COO under Jackson and Callan, and reported directly to Jackson in his role as COO.

221.    When KPMG found out about these allegations in August 2018, it reached out to

Case No.                                    COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

WageWorks' lead independent director to raise additional concerns about the Audit Committee's investigation and recommended that WageWorks take a series of actions to address its concerns. These actions included removing Jackson from his role on the Board and severing his ties to WageWorks completely, as well as an conducting an independent investigation to address management's overriding of controls.   On September 12, 2018, WageWorks announced Jackson's resignation from the Board.

222.   The fact that the OPM Inspector General is pursuing a claim against WageWorks under the False Claims Act is also indicative of scienter.  OPM has alleged that WageWorks falsely claimed that it did not sign the modification to the OPM Contract that was negotiated in July 2016.  This claim by OPM is indicative that senior management knew that WageWorks was not entitled to recognize revenue under the OPM Contract prior to September 1, 2016, and tried to justify their bogus invoice by claiming that the terms of the contract did not reflect the parties' agreement.

223.   Defendants also acted with scienter with respect to the KP Connector. WageWorks admitted in the 2017 Annual Report that "[i]n 2016, the Company re-assessed the fair value of KP Connector" and "determined that KP Connector's carrying value was considered unrecoverable as of June 30, 2016."  Thus, the Company knew that the KP Connector's value was unrecoverable in 2016, but failed to record the impairment until 2019.

224.   Moreover, KPMG identified "the impairment assessment of the Company's KP connector internal use software" as an instance of "management override of controls."  Thus, KPMG explicitly linked the toxic tone at the top created by Jackson and Callan as the reason for the failure to record an impairment charge against the KP Connector.

## PRESUMPTION OF RELIANCE

225.   Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) WageWorks common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to

misjudge the value of WageWorks' common stock; and (e) Plaintiffs purchased WageWorks' common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

226. The market for WageWorks' common stock was open, well-developed and efficient at all relevant times. As a result of the aforementioned materially false and misleading statements, WageWorks' common stock traded at artificially inflated prices during the relevant period. The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations concerning WageWorks' revenue recognized in connection with the OPM Contract, the carrying value of KP Connector, and the effectiveness of WageWorks' internal controls over financial reporting and disclosure controls and procedures.

227. At all relevant times, the market for WageWorks' common stock was efficient for the following reasons, among others: (a) WageWorks filed periodic reports with the SEC; (b) WageWorks' common stock was listed and actively traded on the NYSE during the time that Plaintiffs purchased WageWorks' common stock; (c) numerous analysts followed WageWorks; and (d) WageWorks regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

228. Plaintiffs relied on the market price of WageWorks' common stock, which reflected all the information in the market, including the misstatements by Defendants.

## PLAINTIFFS' ACTUAL RELIANCE

229. During the relevant period, Plaintiffs' investment in WageWorks' common stock was managed by FAM. FAM made the investment decisions with respect to Plaintiffs' purchases of WageWorks' common stock. Factors considered by FAM in making such decisions included, among other things, WageWorks' financial performance and a review of the Company's strengths, weaknesses and opportunities.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

230.    Prior to making the decision to purchase WageWorks' common stock, a FAM investment analyst actually read, reviewed and justifiably relied upon (to the extent the referenced documents had been published at the time) WageWorks' 2016 First Quarter Report, 2016 Second Quarter Report, 2016 Third Quarter Report, 2016 Annual Report, 2017 First Quarter Report, 2017 Second Quarter Report, 2017 Third Quarter Report, the press releases accompanying those reports, and the 2017 Offering Materials including (as applicable):  (a) the statements that the financial statements therein were prepared in accordance with U.S. GAAP, that revenue was recognized only when earned, that WageWorks properly assessed and recorded impairment charges on long-lived assets, and that the information contained in the periodic reports fairly presented, in all material respects, the financial condition and results of operations of WageWorks; (b) the revenue, net income, and EPS figures reported in those reports; and (c) the statements and certifications that WageWorks had effective internal controls over financial reporting and disclosure controls and procedures.

231.    FAM actually and justifiably relied upon information contained in WageWorks' 2016 First Quarter Report, 2016 Second Quarter Report, 2016 Third Quarter Report, 2016 Annual Report, 2017 First Quarter Report, 2017 Second Quarter Report, 2017 Third Quarter Report, the press releases accompanying those reports, and the 2017 Offering Materials (to the extent each such document was on file with the SEC at the time) in making each purchase of WageWorks' common stock alleged herein on behalf of Plaintiffs.

## LOSS CAUSATION

232.    As the truth about WageWorks' overstated financials, accounting violations, and sham control environment gradually and slowly leaked into the market, the price of WageWorks' common stock dropped precipitously.

233.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased WageWorks' common stock, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements.  Specifically, WageWorks' improper booking of revenue, failure to record an impairment charge, and assurances of effective internal

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

controls caused the price of WageWorks' common stock to be artificially inflated.

234.   As a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements with respect to WageWorks' revenue recognition, impairment of long-lived assets, and the effectiveness of its internal controls and disclosure procedures – and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized – the price of WageWorks' stock declined precipitously, and Plaintiffs were damaged.

235.   On March 1, 2018, during trading hours, WageWorks shocked the market by revealing that it was delaying the filing of its 2017 annual report, its 2017 audited financial results, and its earnings call for the fourth quarter of 2017.  In its press release, WageWorks assured the market that it would provide an update to the market "as soon as practicable."

236.   This news signaled to the market that there were serious issues with WageWorks' prior financial reporting.  The announcement by a public company of a delay in the filing of its year-end audited financial results is highly material information to the market.  It is not a step that a company takes lightly, and it is an indication of potentially significant reporting errors and internal control flaws.

237.   In response to this news, WageWorks' stock lost almost 25% of its value.  That day, March 1, 2018, the stock price closed at $42.70/share, down $9.75/share from its prior closing price of $52.45 on February 28, 2018.

238.   In WageWorks' Form 12b-25 Notification of Late Filing with the SEC, it provided the reasons for the delay in reporting its financial results.  First, WageWorks disclosed that its auditor, KPMG, had not yet signed off on its 2017 financial statements:  "[WageWorks] requires additional time to complete its financial statements and its assessment of the Company's internal control over financial reporting; accordingly, the Company's independent registered accounting firm, [KPMG], has not yet completed its audits of the Company's financial statements and the Company's internal control over financial reporting as of December 31, 2017."

239.   Second, WageWorks disclosed that it had a material weakness in its internal

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1
2
3

controls over financial reporting, and that it would disclose more details about this material weakness and its plan to remediate the control deficiency when it finally released its 2017 annual report.

4
5
6
7
8

240.   WageWorks stated that it "has concluded that it has a material weakness in its internal control over financial reporting as of December 31, 2017 related to managing change and assessing risk in the areas of non-routine and complex transactions.  As a result of the material weakness, the Company has concluded that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2017."

9
10
11
12
13

241.   Finally, WageWorks disclosed that the Audit Committee of its Board of Directors would be conducting an investigation concerning the accuracy of WageWorks' prior financial statements for 2016 and 2017, its internal controls over financial reporting, and issues concerning a lack of "an open flow of information" and an inappropriate "tone at the top" of the Company.

14
15
16
17
18
19

242.   WageWorks explained that the Audit Committee's review would include an evaluation of the Company's revenue recognition in 2016 in connection with a government contract.  The Company disclosed that, "[a]mong other matters, the investigation consists of a review of certain issues, including revenue recognition, related to the accounting for a government contract during fiscal 2016 and associated issues with whether there was an open flow of information and appropriate tone at the top for an effective control environment.".

20
21

243.   While this information shocked the market, it did not reveal the full truth about the accounting fraud that had been committed by Defendants.

22
23
24
25

244.   On April 5, 2018, after the markets closed, WageWorks filed a Form 8-K with the SEC attaching a press release.  In the Form 8-K and the accompanying press release, the Company disclosed that, incredibly, its financial statements covering more than a one-year period "should be restated" and "should no longer be relied upon."

26
27
28

245.   In addition, WageWorks stated that the "disclosures related to such financial statements and related communications[,] . . . including management's assessment of internal controls over financial reporting as of December 31, 2016," also should "no longer be relied

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

upon."

246. The fiscal periods identified by the Company as the "Non-Reliance Periods" were:  the second quarter of 2016, the third quarter of 2016, the full year 2016, the first quarter of 2017, the second quarter of 2017, and the third quarter of 2017.

247. Based on the investigation conducted by the Audit Committee, WageWorks disclosed the anticipated impacts on its 2016 financial statements:

- An estimated aggregate decrease in revenue in the range of $6.5 million to $9.5 million.
- An estimated aggregate decrease in net income in the range of $3.5 million to $5.5 million.
- An estimated aggregate decrease in adjusted EBITDA in the approximate range of $6 million to $9 million.

248. However, WageWorks warned that it had "not yet completed its final determination and review," and that "the amounts described above and the periods to which they relate are preliminary and are subject to change."

249. In the accompanying Form 8-K, WageWorks elaborated:  "There can be no assurance that the final amounts and adjustments will not differ materially from the estimated amounts described above, or that additional adjustments will not be identified, the impact of which may be material."

250. In addition to disclosing improper recognition of revenue in 2016, WageWorks disclosed that it was ousting its top executives from their senior management positions.

251. Defendant Jackson was removed as CEO of the Company – a position he had held for over a decade – but was allowed to stay with the company as Chairman of the Board of Directors through the end of the year.

252. Edgar Montes, WageWorks' President and COO, was appointed as CEO to replace Jackson, and was also added to WageWorks' Board of Directors.

253. Defendant Callan was removed as CFO of the Company, effective April 5, 2018. The Company did not announce the appointment of a replacement interim CFO until after the close of markets on April 9, 2018.

Case No.                                    COMPLAINT

254.    Finally, Kim Wilford resigned as Senior Vice President, General Counsel and Corporate Secretary of WageWorks, effective April 5, 2018.

255.    In response to the April 5 disclosure, the price of WageWorks' common stock dropped again, down $2.60/share from a closing price of $45.05/share on April 5, 2018, to a closing price of $43.40/share on April 6, 2018, to a closing price of $42.45/share on April 9, 2018.

256.    On September 12, 2018, WageWorks stunned the market by announcing the formation of the Special Committee to review the Audit Committee's investigation, as well as the "resignations" of Jackson and Byerwalter.

257.    In the announcement, WageWorks disclosed that KPMG had "certain issues, primarily relating to lack of communication concerning allegations made by former management's counsel following the completion of the Audit Committee's investigation (described elsewhere herein) regarding the Audit Committee's awareness that information was withheld from the auditors during 2016 and 2017, and the response to those allegations," but at the same time sought to downplay the significance of KPMG's concerns, stating that the allegations had been found by counsel to the Audit Committee to be "without merit."

258.    Nevertheless, the market understood the significance of KPMG raising additional concerns and the formation of a Special Committee to investigate the Audit Committee. The Company's accounting and internal control issue were more troubling than had previously been disclosed in March and April of 2018. Thus, in response to this news, WageWorks' stock price plummeted, losing 17% of its value, down $8.15/share from a closing on September 12, 2018 of $49.10/share to a closing price of $40.95 on September 13, 2018.

259.    On November 6, 2018, WageWorks disclosed to the market that it was terminating KPMG as its independent auditor.

260.    The Company stated that it was terminating KPMG because KPMG had not issued "an audit report or provided an audit opinion for the fiscal year ended December 31, 2017" and WageWorks wanted to "accelerate the audit process."

261.    However, WageWorks also disclosed the details of KPMG's prior

- 65 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1    recommendations to WageWorks.

2        262.    These details disclosed yet another accounting issue that was not covered by the

3    Audit Committee's investigation:    WageWorks' failure to record an impairment charge in

4    connection with the "KP connector internal use software."

5        263.    Specifically, WageWorks disclosed that KPMG had recommended in August that

6    the Special Committee investigate "other instances of potential management override of controls,

7    such as the impairment assessment of the Company's KP connector internal use software, which

8    were not identified in the initial Audit Committee investigation but have subsequently been

9    raised in the performance of the 2016 re-audit and completion of the 2017 audit."

10       264.    In response to this news, the price of WageWorks common stock once again fell.

11   On November 6, 2018, the stock closed at a price of $42.78/share.   On November 7, 2018, it

12   closed at a price of $40.89/share, and traded as low as $38.16/share.

13                                  **NO SAFE HARBOR**

14       265.    The statutory safe harbor provided for forward-looking statements under certain

15   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

16   The specific statements pleaded herein were not "forward-looking statements" nor were they

17   identified as "forward-looking statements" when made.   Nor was it stated with respect to any of

18   the statements forming the basis of this Complaint that actual results "could differ materially

19   from those projected."   To the extent there were any forward-looking statements, there were no

20   meaningful cautionary statements identifying important factors that could cause actual results to

21   differ materially from those in the purportedly forward-looking statements.   Alternatively, to the

22   extent that the statutory safe harbor does apply to any forward-looking statements pleaded

23   herein, Defendants are liable for those false forward-looking statements because at the time each

24   of those forward-looking statements was made, the particular speaker knew that the particular

25   forward-looking statement was false, and/or the forward-looking statement was authorized

26   and/or approved by an executive officer of WageWorks who knew that those statements were

27   false when made.

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                          COMPLAINT

1

2

**FIRST CAUSE OF ACTION**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

3

4

266.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

5

6

267.   This cause of action is brought against Defendants WageWorks, Jackson, and Callan for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

7

8

9

268.   Defendants WageWorks, Jackson, and Callan both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of WageWorks' common stock; and (iii) cause Plaintiffs to purchase WageWorks' common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, WageWorks, Jackson, and Callan took the actions set forth above.

10

11

12

13

14

15

269.   Defendants WageWorks, Jackson, and Callan both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of WageWorks' common stock in an effort to artificially inflate and maintain the market prices for WageWorks' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

16

17

18

19

20

21

22

270.   By virtue of their high-level positions at the Company, Jackson and Callan were authorized to make public statements, and made public statements on WageWorks' behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 67 -

271.     In addition, WageWorks, Jackson, and Callan had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete and accurate information.

272.     Defendants WageWorks, Jackson, and Callan acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.   Defendants WageWorks', Jackson's, and Callan's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to WageWorks' operations, business, performance and prospects from the investing public, including misreporting WageWorks' revenues and other key financial metrics derived from revenue, failing to record an impairment charge on long-lived assets, and misrepresenting the effectiveness of WageWorks' internal controls.   By concealing these material facts from investors, WageWorks, Jackson, and Callan supported the artificially inflated price of WageWorks' common stock.

273.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of WageWorks' common stock.   In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased WageWorks' common stock at artificially inflated prices.   As a series of partial but inadequate disclosures were issued, the price of WageWorks' securities substantially declined.

274.     At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.   Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of WageWorks, which was concealed by Defendants, Plaintiffs would not have purchased WageWorks' common stock, or if

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

275.    By virtue of the foregoing, Defendants WageWorks, Jackson, and Callan have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

276.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

277.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action against Defendants WageWorks, Jackson, and Callan, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Jackson and Callan

278.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

279.    This Cause of Action is asserted against Defendants Jackson and Callan, and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

280.    Each of Defendants Jackson and Callan was a controlling person of WageWorks within the meaning of Section 20(a) of the Exchange Act.

281.    By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Jackson and Callan had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

282.    Defendants Jackson and Callan were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, Defendants Jackson and Callan each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

283. Defendants Jackson and Callan culpably participated in WageWorks' violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

284. By reason of the conduct alleged in the First Cause of Action, WageWorks is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Jackson and Callan are liable pursuant to Section 20(a) based on their control of WageWorks.

285. Defendants Jackson and Callan are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of WageWorks' common stock.

286. Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action against Defendants Jackson and Callan, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

### THIRD CAUSE OF ACTION

#### Common Law Fraud
#### Against All Defendants

287. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

288. As alleged above, Defendants WageWorks, Jackson and Callan made material misrepresentations of material fact as set forth above.

289. These misrepresentations were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions to invest in WageWorks' common stock.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                                              COMPLAINT

290. These misrepresentations constitute fraud and deceit under the common law.

291. Plaintiffs actually, reasonably and justifiably relied upon the representations when making decisions to purchase WageWorks' common stock and did not know of any of the misrepresentations or omissions.

292. Plaintiffs would not have purchased WageWorks' common stock at all, or at the prices they paid, had they known the truth.

293. As a direct and proximate result of the fraud and deceit by Defendants WageWorks, Jackson, and Callan, Plaintiffs suffered damages in connection with their investment in WageWorks' common stock.

294. Defendants' wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

### FOURTH CAUSE OF ACTION

**Negligent Misrepresentation**
**Against All Defendants**

295. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

296. As alleged above, Defendants WageWorks, Jackson and Callan made material misrepresentations of material fact as set forth above.

297. Defendants supplied false information for use by Plaintiffs in making investment decisions.

298. Defendants had no reasonable grounds for believing the representations were true when made.

299. Defendants had a duty to exercise reasonable care and competence in providing information about WageWorks to Plaintiffs.

300. Defendants made misrepresentations that they knew, or should have known, to be false in order to induce investors, including Plaintiffs, to purchase WageWorks common stock.

301. Defendants breached their duty to exercise reasonable care in making these

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                                    COMPLAINT

1    misrepresentations to Plaintiffs.

2        302.    Plaintiffs actually, reasonably and justifiably relied upon the representations when

3    making decisions to purchase WageWorks' common stock and did not know of any of the

4    misrepresentations or omissions.

5        303.    Plaintiffs would not have purchased WageWorks' common stock at all, or at the

6    prices they paid, had they known the truth.

7        304.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered

8    damages in connection with their investment in WageWorks' common stock.

9

10

11

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)     Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding punitive damages against Defendants;

(c)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(d)     Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

The Plaintiffs hereby demand a trial by jury as to all issues so triable.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.                                    COMPLAINT

1

2

Dated:  February 16, 2021

SHARTSIS FRIESE LLP

3

4

By: _____
      */s/ Robert Charles Ward*
      ROBERT CHARLES WARD

5

6

7

8

Robert Charles Ward (State Bar # 160824)
Shartsis Friese LLP
One Maritime Plaza, 18th Fl.
San Francisco, CA 94111
(415) 421-6500
rward@sflaw.com

9

10

11

12

13

14

Lawrence M. Rolnick (*pro hac vice forthcoming*)
Marc B. Kramer (*pro hac vice forthcoming*)
Michael J. Hampson (*pro hac vice forthcoming*)
Rolnick Kramer Sadighi LLP
1251 Avenue of the Americas, 18th Floor
New York, NY  10020
(212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com

15

16

17

18

19

20

21

22

Attorneys for Plaintiffs
ALGER SMALL CAP GROWTH
INSTITUTIONAL FUND (ALGER SICAV),
ALGER SMALL CAP GROWTH
INSTITUTIONAL FUND, ALGER SMALL CAP
GROWTH FUND, ALGER SMALL CAP FOCUS
FUND, ALGER SMALL CAP GROWTH
PORTFOLIO, ALGER WEATHERBIE
SPECIALIZED GROWTH PORTFOLIO, ALGER
WEATHERBIE SPECIALIZED GROWTH FUND,
DYNAMIC OPPORTUNITIES FUND, and
ALGER DYNAMIC OPPORTUNITIES FUND
(ALGER SICAV)

23

8881400

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 74 -